**The PEOPLE of the State of Colorado, Plaintiff–Appellee,**

v.

**Donald Eugene SMITH, Defendant–Appellant.**

**No. 92SA363.**

Supreme Court of Colorado, En Banc.

March 22, 1993.

Rehearing Denied March 29, 1993.

Gale A. Norton, Atty. Gen., Raymond T. Slaughter, Chief Deputy Atty. Gen., Timothy M. Tymkovich, Sol. Gen., John Daniel Dailey, Deputy Atty. Gen., Robert Mark Russel, First Asst. Atty. Gen., Eric V. Field, Asst. Atty. Gen., Appellate Section, Denver, for plaintiff-appellee.

David F. Vela, Colorado State Public Defender, Robert B. Holt, Special Deputy Public Defender, Denver, for defendant-appellant.

Justice VOLLACK delivered the Opinion of the Court.

Donald Eugene Smith (Smith) appeals the decision of the district court in *People v. Smith*, No. 89CR72 (June 28, 1990), wherein the jury found Smith guilty of first degree murder and the district court sentenced Smith to the mandatory minimum sentence of life imprisonment with no possibility of parole for forty years. § 18–1–105(1)(a)(IV), 8B C.R.S. (1986 & 1989 Supp.); § 16–11–103, 8A C.R.S. (1986 & 1989 Supp.). Smith appeals and contends

that the district court erred by: (1) instructing the jury that the prosecution would not seek the death penalty pursuant to section 16–10–110, 8A C.R.S. (1990);[1] (2) refusing to admit character evidence regarding the decedent; (3) failing to readminister an oath to the jurors ultimately chosen to serve on the panel; and (4) imposing an unconstitutionally disproportionate sentence. We affirm the district court ruling.

## I.

During the afternoon and evening of December 15, 1989, Smith was drinking beer in his apartment with his sixteen-year-old cousin, Brandon Kyle (Brandon), and a group of Brandon's friends. At approximately 1:00 a.m., Bobby Joe Kyle, Smith's uncle, came to Smith's apartment to take his son Brandon home. As he left Smith's apartment with Brandon, Bobby Joe Kyle (the victim) told Smith that he was going to turn him in to the police for contributing to the delinquency of minors.

At approximately 2:10 a.m., Smith went to the home of his former girlfriend. Smith told her that the recruiter for the U.S. Army had told the victim that Smith would not be admitted into the army because he had "failed his test."[2] Smith told her that "the family would be a lot better off without [the victim]" and that "if he could kill [the victim] and get away with it, he would do it." She noted that Smith was intoxicated and appeared to be depressed.

At approximately 3:00 a.m., Smith entered the front doors of the victim's home with a Ruger rifle in his possession. The victim had been sleeping on the living room couch. Aimee, the victim's thirteen-year-old daughter, heard the following events: the front doors opened; the victim exclaimed, "What the hell, Gene";[3] and a series of gun shots were fired. Smith fired seven shots, six of which entered the victim's body. Aimee found the victim attempting to phone for help; Aimee and her brother Cliff called for emergency assistance. The victim died from multiple injuries caused by the gun shots. Later that morning, the police apprehended Smith. Smith was charged with first degree murder.

At trial, the district court administered two oaths to the potential jurors. The first oath was given before the jury questionnaires were distributed; this oath required the potential jurors to truthfully answer all the questions. The second oath was given after the panel of thirty-five potential jurors was accepted for cause, and before the attorneys on both sides exercised their peremptory challenges; this oath required the jurors to well and truly try the case. The district court did not readminister the second oath after selecting the final jury panel. At the beginning of voir dire, the district court informed the jury, pursuant to section 16–10–110, 8A C.R.S. (1990), and over Smith's objection, that the prosecution would not be seeking the death penalty in Smith's case.

Witnesses at trial testified regarding Smith's relationship with the victim over the years and months before the shooting. Smith's grandmother, Ruth Smith, testified that the victim teased Smith; Smith's aunts, Betty Jo Trumble and Charlotte Good, testified as to two incidents, which occurred several years before the killing, where the victim criticized Smith's father.

---

1. This court has jurisdiction over this appeal pursuant to § 13–4–102(1)(b), 6A C.R.S. (1987), because Smith is challenging the constitutionality of § 16–10–110, 8A C.R.S. (1990).

2. During the week before the shooting, Smith was scheduled to take a physical for entrance into the U.S. Army. Smith indicated that he would not be able to pass the physical, and refused to accompany the army recruiters to Grand Junction for processing into the U.S. Army.

When Smith spoke with his former girlfriend, he believed that the army recruiter had conveyed this information to his uncle, the victim. The recruiter, however, maintained at trial that he did not reveal this information to the victim. Nevertheless, during the police investigation after the arrest, Smith stated that he blamed the recruiters, and not the victim, for his failure to get into the army.

3. In his interview with the police, Smith claimed that the victim said: "God damn you, Gene."

Deputy Sheriff Robert Walton (Deputy Walton), one of the arresting officers, testified at trial that Smith made a series of confessional statements to the police. According to Deputy Walton, Smith stated: "I shot him. I hope he dies"; "I emptied my gun into him ... I will plead guilty"; "I wanted to shoot him." Deputy Walton also testified that Smith said that the victim had caused his family enough grief.

Smith sought to introduce evidence demonstrating the violent and abusive tendencies of the victim. Smith requested that information from Social Services files regarding the victim's alleged prior acts of violence and abusive language toward Aimee be introduced as examples of the victim's violent and abusive character. In a written order, the district court refused to admit such character evidence on the ground that Smith had not asserted a claim of self-defense.

Smith additionally sought to question Aimee regarding an alleged incident of violence between the victim and Smith, which occurred many months before the murder. The district court refused to allow this line of questioning because such testimony was beyond the scope of cross-examination.

The jury found Smith guilty of committing murder in the first degree, and the district court sentenced Smith to life imprisonment with no possibility of parole for forty years. We accepted jurisdiction over this appeal and now affirm the district court ruling.

## II.

Smith argues that the district court erred by instructing the jury, pursuant to section 16–10–110, 8A C.R.S. (1990), that the prosecution would not be seeking the death penalty in this action. Section 16–10–110 provides for the following jury instructions in cases involving the possibility of death:

At the trial of any felony in which the prosecution is not seeking the death penalty, upon the request of the prosecution or the defendant, the court shall instruct the jury during voir dire that the prosecution is not seeking the death penalty.

Smith contends that section 16–10–110 is unconstitutional because it requires discussion of the penalty range of a crime during the guilt phase of the trial without also informing the jury that a conviction results in a mandatory life sentence with no possibility of parole for forty years.[4] Noting that constitutional due process requires a fair trial, *Oaks v. People*, 150 Colo. 64, 70, 371 P.2d 443, 447 (1962), Smith contends that

[a]s applied in the instant situation, the statute allows the jury to dismiss the consequences of their actions as being "non-capital." This information may unnecessarily lead to a lack of the [sic] appreciation of the seriousness of [sic] crime, and likewise the seriousness of the punishment. It is respectfully contended at this early juncture in the trial court proceedings that it is fundamentally unfair to instruct the jury regarding one aspect of the consequences of sentencing without presenting the entire sentencing scheme.

"Statutes are presumed constitutional, and one who asserts that a statute violates constitutional standards assumes the burden of proving that assertion beyond a reasonable doubt." *People v. Zinn*, 843 P.2d 1351, 1353 (Colo.1993); *see Bloomer v. Boulder County Bd. of Comm'rs*, 799 P.2d 942, 947 (Colo.1990); *People v. District Court*, 185 Colo. 78, 81, 521 P.2d 1254, 1255 (1974). "Absent the presence of a fundamental constitutional right, legislation that bears a rational relationship to a legitimate governmental interest will survive challenges based on the substantive due process clauses of the United States and Colorado Constitutions."

---

**4.** Smith's argument that a jury will "dismiss the consequences of their actions" and fail to appreciate "the seriousness of the crime ... and ... the punishment" if they are informed, pursuant to § 16–10–110, that the death penalty is not an option, is counterintuitive and without merit. Determining whether an accused committed the crime of first degree murder is one of the most serious questions a jury may be called upon to answer, and it is unreasonable to argue that the members of a jury will discount the serious nature of the crime and possible sentence simply because they know that the defendant will not be sentenced to death.

*Zinn,* 843 P.2d at 1353; *see Ferguson v. People,* 824 P.2d 803 (Colo.1992).

■ We first consider whether it is fundamentally unfair to inform the jury that the death penalty will not be an option, without also explaining the applicable sentencing scheme. The death penalty is the only sentencing decision within the purview of the jury; all other sentencing decisions are made by the judge. § 16–11–101, 8A C.R.S. (1986); § 16–11–103, 8A C.R.S. (1992 Supp.); § 18–1–105(6) to –105(10), 8B C.R.S. (1986 & 1989 Supp.). In addition, in cases where the jury determines that the death penalty should not be applied, "[a] person who has been convicted of a class 1 felony shall be punished by life imprisonment [which] shall mean imprisonment without the possibility of parole for forty calendar years." § 18–1–105(4), 8B C.R.S. (1986 & 1989 Supp.). Thus, the advisement required by section 16–10–110 merely informs the jury during voir dire that it will not be called upon to determine whether the death penalty should be applied, and consequently, that it should not consider sentencing at all. We therefore conclude that section 16–10–110 did not impair Smith's fundamental right to a fair trial.

■ Because we conclude that section 16–10–110 does not infringe on Smith's fundamental right to a fair trial, the rational basis test is the appropriate standard of review in this case.[5] *See Christie v. People,* 837 P.2d 1237, 1245–46 (Colo.1992) (holding that strict scrutiny need not be applied in a due process case where the defendant was not denied the fundamental right to jury trial or to a fair trial); *see also Wills v. State,* 821 P.2d 866, 869 (Colo. App.1991) (holding in an equal protection case that, where a statute did not "significantly interfere with plaintiff's right to a fair trial," the applicable test is whether the legislation bears a reasonable relationship to a legitimate state interest, rather than strict scrutiny analysis).

■ Although the legislative history is silent, we find that section 16–10–110's requirement that the court instruct the jury during voir dire that the prosecution will not be seeking the death penalty bears a rational relationship to the governmental interest of informing the jury that they will not be required to undergo the proceedings necessary to death qualify a jury, and that they will not be called upon to consider the only penalty question which may be presented to a jury: whether the death penalty should be imposed. Accordingly, we conclude in this case that section 16–10–110 is not fundamentally unfair, and did not violate Smith's due process rights.

### III.

■ Smith contends that the district court erred in finding that character evidence concerning the victim's alleged violent and abusive tendencies was inadmissible in the absence of a claim of self-defense. We disagree.

Smith sought to introduce evidence primarily consisting of information from Social Services records documenting the victim's alleged acts of violence and abusive behavior toward the victim's daughter Aimee. In addition, during cross-examination, Smith attempted to elicit testimony from Aimee regarding an alleged violent incident between the victim and Smith, which occurred several months before the killing, during a summer camping trip.

The district court precluded Smith from pursuing this line of questioning because it exceeded the scope of cross-examination. The district court found that, under CRE 404, character evidence regarding prior violent acts by the victim is admissible as an essential element of a self-defense claim by the defendant. The district court concluded that the offered character evidence concerning the victim's prior violent and abusive tendencies was inadmissible because Smith did not raise a claim of self-defense.

Historically, Colorado law has provided that,

---

5. Smith did not argue that this court should engage in strict scrutiny analysis. Because we find that § 16–10–110 does not abridge Smith's right to a fair trial, we do not consider such analysis to be appropriate or necessary.

[w]hen a deliberate and malicious attempt is made to take the life of a human being, and there is no pretense of justification on the ground of self-defense, it would be a dangerous and unreasonable doctrine that would allow the assailant to show quarrels and difficulties of his victim with third persons in no way connected with the transaction. And it would be equally unreasonable ... to allow evidence as to the general reputation or character of the person assailed with reference to his fighting, quarrelsome or dangerous disposition. Such evidence is admissible only when it is claimed that defendant took life, or made the attempt to do so, under reasonable apprehension that he was in imminent danger of receiving at the hands of his adversary death or great bodily harm, and that it was necessary to fire the shot, or strike the blow, to avert the danger.

*McKeone v. People*, 6 Colo. 346, 347 (1882); *see May v. People*, 8 Colo. 210, 227, 6 P. 816, 825–26 (1885) (holding that the defendant could not offer evidence of decedent's reputation for violence, physical strength, and brutality without first showing that the decedent initiated the attack); *Jones v. People*, 6 Colo. 452, 458 (1882) (holding that testimony as to the violent and quarrelsome character of the deceased, "when admitted, is for the purpose of showing a ground for belief in the mind of the slayer that an attack made upon him was dangerous and felonious. Hence, as a proper ground for the introduction of such testimony, an attack must first be shown, the nature of which, together with the known violent and dangerous character of the attacking party, is sufficient ground for belief in the mind of the defendant at the time that the attack is felonious."); *Davidson v. People*, 4 Colo. 145, 150 (1878) (holding that the exclusion of character evidence concerning the deceased was proper because "[i]t is for the [defendant] to first show an attack, and then it is competent for him to show the violent and dangerous character of the deceased, as a ground for his belief that the attack was felonious").

In recent decisions, we have followed this reasoning and held that

[a] defendant is entitled to present evidence of a prior violent act of a victim only if (1) the defendant contends that he acted in self-defense and there is competent evidence to support the contention, (2) either the act occurred or defendant became aware of its occurrence within a reasonable time of the homicide, and (3) the defendant knew of the victim's prior violence at the time of the homicide.

*People v. Ferrell*, 200 Colo. 128, 130, 613 P.2d 324, 326 (1980); *see People v. Jones*, 675 P.2d 9, 14 (Colo.1984) (holding that evidence of prior acts of violence is relevant in support of a self-defense claim, but that such evidence was properly excluded where the defendant was unaware of the victim's prior acts at the time of the assault); *People v. Walker*, 189 Colo. 545, 549, 542 P.2d 1283, 1286 (1975) (holding that evidence of the victim's turbulent and dangerous character was properly admitted because: "(a) the defendant had laid a proper foundation by establishing a case of self-defense; (b) at the time of the assault the defendant had knowledge of [the victim's] character; and (c) it was relevant to the defense of self-defense raised in the assault charge" (citations omitted)); *People v. Flores*, 189 Colo. 209, 211, 539 P.2d 1236, 1238 (1975) (holding that "[t]he general rule is that specific acts of violence by the victim of an assault are not admissible. However, as we explained in *Burress*, this rule is inapplicable in cases where the defendant contends that he acted in self-defense, and at the time of the victim's assault, the defendant was aware of the victim's prior acts of violence"); *People v. Burress*, 183 Colo. 146, 152–53, 515 P.2d 460, 464 (1973) (holding that a defendant must lay the proper foundation before introducing evidence of a specific act of violence in support of a self-defense claim, and that, specifically, the defendant must show "(1) that he was aware that the specific violent act took place, and (2) that either the act occurred or the defendant became aware of its occurrence within a reasonable time of his use of force in self-defense"); *Ballay v. People*, 160 Colo. 309, 314, 419 P.2d 446, 449 (1966) (holding that

evidence of a prior violent act by the decedent was properly excluded because "there must be some competent evidence to support a claim of self-defense before such evidence would be admissible, and the defendant must have known of the incident at the time of the homicide"); *People v. Lucero,* 714 P.2d 498, 502 (Colo.App.1985) (holding that "[e]vidence of prior violent acts by the victim is admissible as direct evidence of an essential element of self defense, that is, the reasonableness of a defendant's belief in the imminent use of unlawful physical force against him. But such evidence is admissible only if the defendant knew of the victim's prior violence at the time of the offense" (citations omitted)).

In the present case, Smith did not contend that he acted in defense of himself or Aimee, and the record does not support either a claim of self-defense or a claim that Smith acted to protect a third person. Smith entered the victim's home at approximately 3:00 a.m. with a rifle. The victim, who had been sleeping on the living room couch, merely exclaimed, "What the hell, Gene," or, "God damn you, Gene," before Smith fired seven shots at him. In addition, the alleged acts of violence between Smith and the victim during the summer camping trip occurred several months before the killing, and therefore, under *Burress,* an unreasonable amount of time transpired. *Burress,* 183 Colo. at 153, 515 P.2d at 464.[6] The alleged acts are also unrelated to the events which occurred on the evening before the shooting. Furthermore, in the absence of a claim of self-defense, "it would be dangerous and unreasonable" to admit evidence concerning the victim's alleged abusive behavior toward Aimee, "a third person[ ] in no way connected with the transaction." *McKeone,* 6 Colo. at 347. We therefore conclude that, in the absence of a claim of self-defense, the district court properly excluded evidence of alleged violent and abusive acts by the victim.

## IV.

Smith argues that the district court committed reversible error by failing to readminister the oath to the jurors selected to hear the case. We disagree.

The record reflects that two oaths were given to the potential jurors.[7] The first oath, requiring the potential jurors to truthfully answer the questions, was administered before the jury questionnaires were distributed. The second oath, requiring the jurors to well and truly try the case, was administered after the panel of thirty-five potential jurors was accepted for cause, and before the prosecution and defense attorneys exercised their peremptory challenges.

■ Although this court has held that the procedure of administering an oath to a jury charged with trying a case has been judicially recognized and is implicitly required, we have not articulated any guidelines as to when such an oath must be administered. *Hollis v. People,* 630 P.2d 68, 69 (Colo.1981). In *Hollis,* we found that, "[w]hile there is no explicit statute or rule requiring the administration of an oath to a jury in this state, the need for such an oath has been judicially recognized. As well, our rules of criminal procedure implicitly require that a jury will be sworn to try

---

6. Smith also sought to introduce evidence of the victim's violent and abusive tendencies in support of a "heat of passion" defense. The trial court concluded that, "[w]ith respect to a 'heat of passion' defense, there is no established case law or Rule which discusses [the] admissibility of character evidence." We conclude that the evidence does not support heat of passion, and find that the trial court properly excluded the evidence for that purpose.

7. Prior to the presentation of opening statements by counsel, the following exchange ensued between defense counsel and the district court:

[DEFENSE COUNSEL]: A couple of things. You haven't sworn the jury yet.

THE COURT: We did. We swore the thirty-five before we dismissed the balance.

[DEFENSE COUNSEL]: Once the twelve are chosen, you have to swear—

THE COURT: It's the same oath that they well and truly try the case.

[DEFENSE COUNSEL]: I thought the other oath was truly answer all the questions.

THE COURT: That was given before anybody even answered the questionnaires.

a case." *Id.* at 69 (citations omitted). The trial court in *Hollis* administered the oath to the jury after the first witness completed her testimony. We held that the trial court's failure to swear in the jury at the commencement of the trial constituted harmless error. *Id.* at 70.

■ The better practice is to give the oath to truly try the case solely to the jurors selected to hear the case. Nevertheless, absent any showing of prejudice by the defendant, the administration of the oath to the panel of jurors accepted for cause before the exercise of peremptory challenges does not constitute reversible error.

## V.

■ Smith contends that his sentence of life imprisonment with no possibility for parole for forty years under section 16–11–103, 8A C.R.S. (1986 & 1989 Supp.), is an unconstitutionally disproportionate sentence when applied to a twenty-year-old defendant with no prior felony record.[8]

We disagree, and find that Smith's mandatory sentence to life imprisonment with no possibility of parole for forty years for committing first degree murder does not violate the Eighth Amendment's prohibition against cruel and unusual punishment.

## A.

The Eighth Amendment to the United States Constitution provides: "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." U.S. Const. amend. XIII. In *Solem v. Helm*, 463 U.S. 277, 284, 103 S.Ct. 3001, 3006, 77 L.Ed.2d 637 (1983), the United States Supreme Court found that the Eighth Amendment "prohibits not only barbaric punishments, but also sen-

tences that are disproportionate to the crime committed." In *Solem*, Jerry Helm was convicted of writing a "no account" check for $100, and sentenced under South Dakota's recidivist statute to life imprisonment without the possibility of parole.[9] In the absence of prior convictions, the ordinary maximum punishment for writing a "no account" check would have been five years imprisonment and a $5,000 fine. The *Solem* Court found that the sentence imposed upon Helm was significantly disproportionate to his crime, and was therefore prohibited by the Eighth Amendment. *Solem*, 463 U.S. at 303, 103 S.Ct. at 3016. The Court in *Solem* held, "as a matter of principle[,] that a criminal sentence must be proportionate to the crime for which the defendant has been convicted." *Id.* at 290, 103 S.Ct. at 3016. *Solem* further held:

When sentences are reviewed under the Eighth Amendment, courts should be guided by objective factors that our cases have recognized. First, we look to the gravity of the offense and the harshness of the penalty....

Second, it may be helpful to compare the sentences imposed on other criminals in the same jurisdiction....

Third, courts may find it useful to compare the sentences imposed for commission of the same crime in other jurisdictions.

*Id.* at 290–92, 103 S.Ct. at 3010.

Relying on *Solem*, this court has held in a series of cases that an abbreviated form of the proportionality review outlined in *Solem* is required when a defendant challenges the constitutionality of a life sentence imposed under the habitual criminal statute. *People v. Gaskins*, 825 P.2d 30, 31 (Colo.1992); *Alvarez v. People*, 797 P.2d 37, 40 (Colo.1990); *People v. Drake*, 785 P.2d 1257, 1275 (Colo.1990); *People v. Her-*

8. Smith's entire argument consists of the following statements:

  The automatic and impliedly objective and non-quantitative imposition of [a] statutory sentence in the instant situation denied the defendant of any type of proportionality consideration. The automatic sentencing of a twenty year old offender with no prior felony record is repugnant to the spirit of the Eighth

  Amendment Constitutional prohibition against Cruel and Unusual punishment.

9. Helm had a total of six prior nonviolent felony convictions: three for third degree burglary, and one each for obtaining money under false pretenses, grand larceny, and driving while intoxicated. *Solem v. Helm*, 463 U.S. 277, 103 S.Ct. 3001, 77 L.Ed.2d 637 (1983).

*nandez,* 686 P.2d 1325, 1329 (Colo.1984). The abbreviated proportionality review applied in these habitual offender cases "consists of a scrutiny of the offenses in question to determine whether in combination they are so lacking in gravity or seriousness as to suggest that a life sentence is constitutionally disproportionate to the crime, taking into account the defendant's eligibility for parole." *Gaskins,* 825 P.2d at 36. Unlike *Gaskins, Alvarez, Drake,* and *Hernandez,* however, the present action does not involve a habitual criminal conviction. Rather, Smith was convicted of the single offense of first degree murder, and received the statutorily mandated sentence for that conviction.

In *Harmelin v. Michigan,* —— U.S. ——, 111 S.Ct. 2680, 115 L.Ed.2d 836 (1991), the Supreme Court considered an Eighth Amendment challenge to a statutorily mandated sentence in a non-habitual offender case. The defendant in *Harmelin* was convicted of possessing more than 650 grams of cocaine, and was sentenced to a mandatory term of life in prison without the possibility of parole. In a 5–4 decision, the Supreme Court found that the mandatory sentence did not constitute cruel and unusual punishment in violation of the Eighth Amendment, and accordingly held that the sentence was valid. *Id.* at ——, 111 S.Ct. at 2701–02. Nevertheless, the justices disagreed as to what type of proportionality review, if any, was required. Justice Scalia,[10] joined by Chief Justice Rehnquist, wrote that *Solem* should be overturned because the Eighth Amendment contains no proportionality guarantee. *Harmelin,* —— U.S. at ——, 111 S.Ct. at 2686.

Conversely, Justice White, joined by Justice Blackmun and Justice Stevens, wrote in his dissent that "there can be no doubt that prior decisions of this Court have construed [the] words ["cruel and unusual"] to include a proportionality principle." *Id.* at ——, 111 S.Ct. at 2710. Justice White concluded that all three factors from *Solem* must be applied and that, under *Solem,* Harmelin's sentence violated the Eighth Amendment's prohibition against cruel and unusual punishment.

In his concurrence, Justice Kennedy, joined by Justice O'Connor and Justice Souter, found that the Court's decisions recognize a narrow proportionality principle under the Cruel and Unusual Punishments Clause of the Eighth Amendment. *Id.* at ——, 111 S.Ct. at 2702. In defining this limited proportionality principle, Justice Kennedy reasoned that one of the foremost principles consistently articulated by the Supreme Court in cases concerning proportionality review is that "the fixing of prison terms for specific crimes involves a substantial penological judgment that, as a general matter, is 'properly within the province of legislatures, not courts.'" *Id.* at ——, 111 S.Ct. at 2703 (quoting *Rummel v. Estelle,* 445 U.S. 263, 275–76, 100 S.Ct. 1133, 1140, 63 L.Ed.2d 382 (1980)); *see Solem,* 463 U.S. at 290, 103 S.Ct. at 3009 ("[R]eviewing courts ... should grant substantial deference to the broad authority that legislatures necessarily possess in determining the types and limits of punishments for crimes."); *Gore v. United States,* 357 U.S. 386, 393, 78 S.Ct. 1280, 1285, 2 L.Ed.2d 1405 (1958) (questions regarding the severity of punishment are peculiarly issues of legislative policy); *Weems v. United States,* 217 U.S. 349, 379, 30 S.Ct. 544, 554, 54 L.Ed. 793 (1910) ("The function of the legislature is primary, its exercises fortified by presumptions of right and legality, and is not to be interfered with lightly, nor by any judicial conception of their wisdom or propriety."). Justice Kennedy noted that the contours of proportionality review are also shaped by "the variety of legitimate penological schemes, the nature of our federal system, and the requirement that proportionality review be guided by objective factors." *Harmelin,*

---

**10.** Justice Scalia delivered the opinion of the court with respect to Part V, holding that the imposition of a severe mandatory sentence, without any consideration of mitigating factors such as the defendant's lack of any prior offenses, does not constitute cruel and unusual punishment under the Eighth Amendment. Only Chief Justice Rehnquist, however, joined Justice Scalia in parts I, II, III, and IV, which addressed Harmelin's claim that his sentence was "disproportionate" under the Eighth Amendment.

— U.S. at ——, 111 S.Ct. at 2705. Based upon these principles, Justice Kennedy concluded that "the Eighth Amendment does not require strict proportionality between crime and sentence. Rather, it forbids only extreme sentences that are 'grossly disproportionate' to the crime." *Id.* at ——, 111 S.Ct. at 2705. Accordingly, Justice Kennedy only applied the first factor of the *Solem* test—the gravity of the offense and the harshness of the penalty—and found that Harmelin's mandatory sentence to life in prison without the possibility of parole is not grossly disproportionate to the crime of possessing more than 650 grams of cocaine.

In *Gaskins,* we stated that *Harmelin* "leaves the future of *Solem* somewhat clouded," but that, "[i]n the absence of more definitive guidance from the United States Supreme Court, we shall adhere to our prior understanding of the requirements of *Solem." Gaskins,* 825 P.2d at 34 n. 10. *Solem'*s analysis is not readily applicable to the present action, however, because *Solem,* like this court's previous rulings in *Gaskins, Alvarez, Drake,* and *Hernandez,* is a habitual offender case, while *Harmelin* and the present action are not habitual offender cases. As we stated in *Gaskins* and *Alvarez,* "[t]he provisions of the Habitual Criminal Act create a unique possibility that a defendant will receive a life sentence which is not proportionate to the crime for which the defendant has been convicted." *Gaskins,* 825 P.2d at 34; *Alvarez,* 797 P.2d at 40. In analyzing the proportionality issue in the context of a non-habitual offender case, we agree with Justice Kennedy's conclusion in *Harmelin* that a narrow proportionality principle exists under the Eighth Amendment, *Harmelin,* —— U.S. at ——, 111 S.Ct. at 2702, and that the scope of this proportionality principle is limited by such countervailing principles as the primacy of the legislature in determining the types and limits of punishments for crimes. *Id.* at ——, 111 S.Ct. at 2703–04; *see Solem,* 463 U.S. at 290, 103 S.Ct. at 3009; *United States v. Abreu,* 962 F.2d 1425, 1428–29 (10th Cir.1992), *petition for cert. filed,* 61 U.S.L.W. 3060 (U.S. July 9, 1992) (No. 92–67); *Gaskins,* 825 P.2d at 33; *Alvarez,* 797 P.2d at 39. In his *Harmelin* concurrence, Justice Kennedy concluded:

> [I]ntra- and inter-jurisdictional analyses are appropriate only in the rare case in which a threshold comparison of the crime committed and the sentence imposed leads to an inference of gross disproportionality. . . .
>
> The proper role for comparative analysis of sentences, then, is to validate an initial judgment that a sentence is grossly disproportionate to a crime. . . . In light of the gravity of petitioner's offense, a comparison of his crime with his sentence does not give rise to an inference of gross disproportionality, and comparative analysis of his sentence with others in Michigan and across the Nation need not be performed.

*Harmelin,* —— U.S. at ——, 111 S.Ct. at 2707. In the present action, which, like *Harmelin,* involves a mandatory sentence imposed in a non-habitual case, we conclude that the appropriate review of proportionality is a comparison of the gravity of the offense and the harshness of the penalty.

Smith was convicted of first degree murder, a crime of the utmost gravity. First degree murder is classified as a class 1 felony in Colorado. § 18–3–102, 8B C.R.S. (1986). Class 1 felonies are subject to a minimum sentence of life imprisonment and a maximum sentence of death under section 18–1–105, 8B C.R.S. (1986 & 1989 Supp.). Smith's sentence to life imprisonment with no possibility of parole for forty years—the minimum sentence possible under the statutory scheme—is not disproportionate to the crime of first degree murder. *See United States v. Gonzales,* 922 F.2d 1044, 1053 (2d Cir.1991).

### B.

Justice Scalia, who delivered the opinion of the Court with respect to Part V, rejected the argument for individualized sentencing in noncapital cases based upon "mitigating" factors. *Harmelin,* —— U.S. at ——, 111 S.Ct. at 2702. In Part V, the *Harmelin* Court held:

In some cases ... there will be negligible difference between life without parole and other sentences of imprisonment—for example, a life sentence with eligibility for parole after 20 years, or even a lengthy term sentence without eligibility for parole, given to a 65–year–old man. But even where the difference is the greatest, it cannot be compared with death. We have drawn the line of required individualized sentencing at capital cases, and see no basis for extending it further.

*Id.* Thus, the Court concluded in Part V of *Harmelin* that the imposition of a mandatory sentence of life imprisonment without the possibility of parole, and without consideration of mitigating factors such as the defendant's lack of prior felony convictions, did not constitute cruel and unusual punishment. *Id.* at ——, 111 S.Ct. at 2701. The court observed further that "[t]here can be no serious contention, then, that a sentence which is not otherwise cruel and unusual becomes so simply because it is 'mandatory'" because "[s]evere, mandatory penalties may be cruel, but they are not unusual in the constitutional sense." *Id.*

The Tenth Circuit Court of Appeals has also held that "[a] sentence of imprisonment for a very long term of years, the effect of which is to deny a prisoner eligibility for parole until a time beyond his life expectancy, does not violate the Eighth Amendment prohibition of imposition of cruel and unusual punishment." *United States v. O'Driscoll,* 761 F.2d 589, 599 (10th Cir.1985); *see United States v. Abreu,* 962 F.2d 1425, 1428 (10th Cir.1992) (following *Harmelin* in rejecting appellant's argument that his mandatory minimum sentence is unconstitutional because it deprives him of "individualized" sentencing). Similarly, the Eighth Circuit Court of Appeals has also determined that such factors as age and life expectancy are irrelevant to the validity of an individual's sentence under the Eighth Amendment. *See United States v. Murphy,* 899 F.2d 714 (8th Cir.1990) (holding that forty-year-old narcotics defendant's present age is irrelevant to the validity of his sentence under the Eighth Amendment; although the sentence is stringent, it does not violate the constitutional prohibition against cruel and unusual punishment); *United States v. Mendoza,* 876 F.2d 639 (8th Cir.1989) (holding that a fifteen-year sentence imposed upon a defendant convicted of narcotics offenses did not constitute cruel and unusual punishment in violation of the Eighth Amendment, even though the defendant suffered from chronic kidney failure, and claimed that his life expectancy was substantially shorter than normal).

Based upon the foregoing analysis and the facts of this case, we find that Smith's statutorily mandated sentence of life in prison with no possibility of parole for forty years for committing the crime of first degree murder is not disproportionate, and does not violate the Eighth Amendment. *See* § 18–1–105(1)(a)(IV); § 16–11–103.

## VI.

We affirm the judgment and sentence of the district court.