2012 COA 106

**The PEOPLE of the State of Colorado, Plaintiff–Appellee,**

v.

**Charles E. DEAN, Defendant–Appellant.**

**No. 09CA1747.**

Colorado Court of Appeals,
Div. V.

June 21, 2012.

John W. Suthers, Attorney General, Ryan A. Crane, Assistant Attorney General, Denver, Colorado, for Plaintiff–Appellee.

Alison Ruttenberg, Boulder, Colorado, for Defendant–Appellant.

Opinion by Judge LOEB.

¶ 1 Defendant, Charles E. Dean, appeals the judgment of conviction entered and sentence imposed on a jury verdict finding him guilty of second degree murder. We affirm and remand for correction of the mittimus.

## I. Background

¶ 2 According to evidence presented by the prosecution at trial, defendant and the victim had been friends for nearly thirty years. Despite this friendship, in 2001, defendant

assaulted and beat the victim by continuously kicking him in the head, even after the victim had lost consciousness, over the perceived theft of a small amount of crack cocaine. After this incident, defendant and the victim remained friends and, in the months before the victim's death, had been essentially living together in the victim's duplex apartment. Evidence at trial established that they also smoked crack cocaine together.

¶ 3 In October 2004, defendant again severely beat the victim. Following the beating, defendant placed the victim in a closet and shut the door. Throughout the night, in response to the victim's cries and moans, defendant returned to the closet and beat the victim several more times. In the morning, when defendant checked on the victim, he was dead.

¶ 4 Defendant then called two friends to help dispose of the body. His friends arrived at the apartment with a chainsaw, and together they dragged the victim's body into the bathroom and put it in the bathtub. Using the chainsaw, defendant then dismembered the body and placed the body parts into plastic trash bags. After loading defendant's pick-up truck with the trash bags, they drove around Denver and threw the trash bags in various dumpsters throughout the city. Neither the body parts nor the chainsaw was ever recovered.

¶ 5 Later, defendant set fire to the victim's apartment in an effort to cover up any remaining evidence of the murder. The fire department arrived at the apartment and, after taming the blaze, discovered biological material in the bathroom. The police arrived and recovered the biological material, which included blood, tissue, cartilage, and bone fragments. Through DNA testing, this biological material was later determined to belong to the victim. In their search of the apartment, the police also found drug paraphernalia, including two crack cocaine pipes.

¶ 6 In connection with these events, defendant was charged with first degree murder. At trial, defendant's theory of defense was that he did not kill his "best friend" or set fire to the apartment, had not been in the apartment when the incidents took place, and did not know who committed the crimes.

Defendant argued consistently with this theory at trial and sought to expose weaknesses in the prosecution's evidence linking him to the crime.

¶ 7 The prosecution's theory was that defendant "snapped" and beat the victim to death, possibly over a dispute involving crack cocaine. To establish defendant's motive for killing his "best friend" and to establish defendant's identity as the perpetrator, the prosecution introduced other acts evidence under CRE 404(b), including the 2001 incident discussed above in which defendant beat the victim over the perceived theft of a small amount of crack, and other instances in which witnesses testified to defendant's prior use of crack cocaine.

¶ 8 The jury convicted defendant of the lesser included offense of second degree murder, a class 2 felony, which has a maximum presumptive sentence of twenty-four years. *See* § 18–1.3–401(1)(a)(V)(A), C.R.S. 2011. Following his conviction, defendant was also adjudicated by the trial court as a habitual criminal for committing a felony (second degree murder) after having sustained three previous felony convictions. *See* § 18–1.3–801(2), C.R.S.2011. In accordance with the applicable habitual offender and parole eligibility statutes, defendant was sentenced to four times the presumptive maximum sentence for second degree murder, or ninety-six years, and will be eligible for parole after completing seventy-five percent of his prison sentence (seventy-two years). *See id.;* § 17–22.5–403(2.5)(a), C.R.S.2011.

¶ 9 This appeal followed.

## II. Equal Protection

¶ 10 Defendant first contends that the trial court erred by ruling that he could be constitutionally sentenced as a habitual offender under section 18–1.3–801, C.R.S.2011, because that statute (in connection with section 17–22.5–403(2.5)(a)), as applied to him, denied him equal protection of the laws as to his parole eligibility. We disagree.

### A. Standard of Review and Applicable Law

¶ 11 We review the constitutionality of statutes de novo. *Hinojos–Mendoza v.*

**1070**

*People,* 169 P.3d 662, 668 (Colo.2007). Statutes are presumed to be constitutional, and the party attacking the validity of a statute bears the burden of establishing unconstitutionality beyond a reasonable doubt. *Id.; People v. Dash,* 104 P.3d 286, 290 (Colo.App. 2004).

¶ 12 Equal protection of the laws is guaranteed by the Fourteenth Amendment of the United States Constitution and article II, section 25 of the Colorado Constitution. *People v. Oliver,* 745 P.2d 222, 227 (Colo. 1987). Equal protection guarantees that similarly situated persons receive similar treatment. *People v. Mozee,* 723 P.2d 117, 126 (Colo.1986). Because equal protection requires equal treatment, "the threshold question in an equal protection challenge is whether the person alleging disparate treatment is in fact similarly situated." *People v. Friesen,* 45 P.3d 784, 785 (Colo.App.2001). Accordingly, "equal protection is offended ... when two statutes forbid *identical* conduct." *People v. Stewart,* 55 P.3d 107, 114 (Colo.2002) (emphasis in original). However, if, as a result of a particular statutory scheme, an offender who acts with less culpable intent and causes a less grievous result is afforded a greater penalty, then the statute involved may nonetheless violate equal protection. This is so despite the fact that persons charged under different offenses may not be "similarly situated." *People v. Suazo,* 867 P.2d 161, 164 (Colo.App.1993); *see also Smith v. People,* 852 P.2d 420, 421–22 (Colo.1993); *People v. Harper,* 111 P.3d 482, 484 (Colo.App.2004) ("[A] statute may be constitutionally infirm if it imposes a harsher penalty on less serious conduct.").

¶ 13 On appeal, the parties do not dispute, and we agree, that a rational basis standard of review applies here because no fundamental right is at stake, and the habitual offender act does not create a suspect or quasi-suspect class. *See Greenholtz v. Inmates of Nebraska Penal & Corr. Complex,* 442 U.S. 1, 7, 99 S.Ct. 2100, 60 L.Ed.2d 668 (1979) ("There is no constitutional or inherent right of a convicted person to be conditionally released before the expiration of a valid sentence."); *Andretti v. Johnson,* 779 P.2d 382, 384 (Colo.1989) (holding that Colorado's parole eligibility statutes "do not create an expectation of release before the expiration of a valid sentence so as to entitle prisoners to constitutional protections"). Under rational basis review, the challenging party must demonstrate beyond a reasonable doubt that the classification bears no rational relationship to a legitimate legislative interest or government objective, or that the classification is unreasonable, arbitrary, or capricious. *People v. Blankenship,* 119 P.3d 552, 555 (Colo.App.2005).

### B. Analysis

¶ 14 Defendant was charged with first degree murder and six habitual criminal counts. Following his conviction for second degree murder and before the sentencing phase of his trial, defendant filed a motion arguing, among other things, that he could not be constitutionally sentenced as a habitual offender under section 18–1.3–801 because that statute, as applied to him, violated his right to equal protection of the laws. At the sentencing hearing, the trial court rejected defendant's equal protection argument, found he had committed five of the six charged habitual offender counts, and sentenced him accordingly under section 18–1.3–801(2) to four times the presumptive maximum sentence for second degree murder, or ninety-six years.

### 1. Defendant's Contention

¶ 15 On appeal, defendant's equal protection argument, which is the same argument that he made in the trial court, can be summarized as follows.

¶ 16 Under section 18–1.3–801(1), a defendant convicted of a class 1 or class 2 felony, or a class 3 felony that is a crime of violence, shall be sentenced to "life imprisonment" if he or she has previously sustained two such convictions. "No person sentenced pursuant to [section 18–1.3–801(1) ] shall be eligible for parole until such person has served at least forty calendar years." § 18–1.3–801(1)(c). A defendant eligible for sentencing under section 18–1.3–801(1) cannot be sentenced pursuant to another subsection of the habitual offender act. § 18–1.3–801(4).

¶ 17 Under section 18–1.3–801(2), the subsection under which defendant was sentenced here, a defendant convicted of *any* felony shall be sentenced to four times the maximum of the presumptive range for such felony if he or she has previously sustained three convictions for *any* felony. Under Colorado's parole eligibility statute, a defendant who, as here, is convicted of second degree murder "shall be eligible for parole after such person has served seventy-five percent of the sentence imposed upon such person." § 17–22.5–403(2.5)(a).

¶ 18 Defendant was convicted of second degree murder, a class 2 felony, which carries a presumptive maximum sentence of twenty-four years. *See* § 18–1.3–401(1)(a)(V)(A). Because none of defendant's previous felony convictions were for class 1 or class 2 felonies, or class 3 felonies that were crimes of violence, defendant was ineligible for sentencing under section 18–1.3–801(1), for which he would have received a mandatory sentence of life imprisonment and been eligible for parole after serving "at least forty calendar years." Instead, defendant was adjudicated a habitual offender under section 18–1.3–801(2) for having sustained three prior convictions for *any* felony. Accordingly, the court sentenced defendant to four times the presumptive maximum sentence for second degree murder, or ninety-six years, and he will be eligible for parole after completing seventy-five percent of his sentence, which equates to seventy-two years.

¶ 19 Defendant contends that the habitual offender act, as it applies to him, does not have a rational basis because he is, in effect, being punished more severely under section 18–1.3–801(2) and section 17–22.5–403(2.5)(a) for having a nonviolent, less serious criminal history, and must serve thirty-two more years in prison before becoming eligible for parole than a defendant sentenced to life imprisonment under section 18–1.3–801(1). In essence, defendant contends that the habitual criminal statute, as applied to him, violates equal protection because it leads to the "irrational" and "absurd" result that nonviolent previous offenders, such as defendant

here, are treated more severely than violent ones. We disagree.

### 2. *People v. Calvaresi*

¶ 20 At the outset, we reject the People's contention on appeal that we use this case as an opportunity to "abandon" and "overrule" the Colorado Supreme Court's opinion in *People v. Calvaresi,* 188 Colo. 277, 534 P.2d 316 (1975). Relying on *United States v. Batchelder,* 442 U.S. 114, 99 S.Ct. 2198, 60 L.Ed.2d 755 (1979), and a number of out-of-state cases adopting *Batchelder*'s rule as a matter of state constitutional law, the People contend that we should "abandon the notion that 'equal protection' prohibits the assignment of disparate penalties to identical conduct," the rule adopted in *Calvaresi* as a matter of state constitutional law.

¶ 21 In *Batchelder,* the United States Supreme Court held that the prosecution and punishment of an accused for criminal conduct that was identically defined but differently punished under separate sections of a statutory scheme did not violate equal protection of the laws under the Fourteenth Amendment of the United States Constitution. *Id.* at 123–24, 99 S.Ct. 2198.

¶ 22 However, "[i]n sharp contrast to *Batchelder,*" the Colorado Supreme Court has consistently held that equal protection of the laws under Colorado's equal protection guarantee requires that statutory classifications of crimes be based on differences that are "real in fact and reasonably related to the general purposes of criminal legislation." *People v. Marcy,* 628 P.2d 69, 74 (Colo.1981); *see also Stewart,* 55 P.3d at 114; *Calvaresi,* 188 Colo. at 282, 534 P.2d at 318 ("A statute which prescribes different degrees of punishment for the same acts committed under like circumstances by persons in like situations is violative of a person's right to equal protection of the laws."). Accordingly, in Colorado, equal protection is violated where two statutes provide different punishments for identical criminal conduct. *People v. Kendall,* 174 P.3d 791, 794 (Colo.App.2007); *cf. Smith,* 852 P.2d at 421–22; *Suazo,* 867 P.2d at 164.

¶ 23 We reject the People's contention for two reasons. First, as a division of the

state's intermediate appellate court, we cannot "overrule" our supreme court, even if, as the People contend, Colorado's equal protection rule is in the minority and there may be persuasive reasons to revisit it. *See People v. Carbajal*, 2012 COA 34, ¶ 18, —— P.3d ——, 2012 WL 663165 ("Our supreme court is the final arbiter of our state constitution, and we are bound by its precedent.").

¶ 24 Second, the People seemingly misunderstand defendant's contention on appeal, which, in our view, does not implicate the rule announced in *Calvaresi*. In his opening brief, defendant does not contend that the habitual criminal statute violates equal protection because it "prescribes different degrees of punishment for the same acts committed under like circumstances by persons in like situations." *See Calvaresi*, 188 Colo. at 282, 534 P.2d at 318. Rather, defendant contends that the habitual offender act, as applied to him, is irrational and violates equal protection because it effectively punishes him more severely than it would a defendant sentenced to life imprisonment under section 18–1.3–801(1).

### 3. Equal Protection Analysis

¶ 25 Having summarized defendant's contention above, and having discussed defendant's contention in light of *Calvaresi*, we now turn to an analysis of defendant's equal protection claim.

¶ 26 As a threshold matter, the constitutional guarantee of equal protection of the laws requires like treatment of persons who are similarly situated. *People v. Mendoza*, —— P.3d ——, ——, 2011 WL 4837499 (Colo. App.2011); *People v. Watkins*, 126 P.3d 309, 311 (Colo.App.2005). To state a claim for an equal protection violation, a defendant must establish that he or she is treated differently from similarly situated individuals. *Mendoza*, —— P.3d at ——; *Watkins*, 126 P.3d at 311. Thus, "the threshold question in an equal protection challenge is whether the person alleging disparate treatment is in fact similarly situated." *Friesen*, 45 P.3d at 785. If a defendant alleging disparate treatment is not similarly situated to those treated differently, his or her equal protection claim will normally fail. *Watkins*, 126 P.3d at 311; *cf.*

*Smith*, 852 P.2d at 421–22; *Suazo*, 867 P.2d at 164.

¶ 27 The People contend that defendant's equal protection claim fails because the two statutory subsections at issue do not apply to identical conduct. Specifically, the People note that section 18–1.3–801(1) of the habitual offender act applies to a defendant who is convicted of a class 1 or class 2 felony, or a class 3 felony that is a crime of violence, and who has previously sustained two such convictions. By contrast, section 18–1.3–801(2) applies to a defendant who is convicted of *any* felony, and who has previously sustained three felony convictions, regardless ·of class. Because these subsections apply to different crimes and, therefore, different behavior, the People contend that defendant's equal protection claim fails because the statutory subsections do not apply to identical conduct. *See People v. Prieto*, 124 P.3d 842, 845 (Colo. App.2005) ("If, however, the statutory classifications of crimes are based upon differences that are both real in fact and reasonably related to the purposes of the legislation, equal protection principles are not offended.").

¶ 28 In response, defendant contends that the "conduct" in question is his second degree murder conviction, which is the same regardless of the subsection of the habitual offender act under which he was sentenced, and that the supposed disparity between the sentencing schemes "is precisely why there is an equal protection issue."

¶ 29 We note that defendant's contention on appeal is somewhat novel because it is not akin to a traditional equal protection claim, such as when different criminal penalties are imposed for identical criminal acts. *See Friesen*, 45 P.3d at 785; *see also Suazo*, 867 P.2d at 164 ("Because the offenses implicated here are different and therefore persons charged under them are not 'similarly situated,' the issue presented does not fall under traditional concepts of equal protection.") Nor is defendant's contention entirely analogous to an equal protection claim attacking the validity of a sentencing enhancement scheme where the underlying crime remains the same but the punishment varies depending on the identity of the victim. *See People*

*v. Wells,* 775 P.2d 563, 565 (Colo.1989) (reasoning that two subsections of a sentencing scheme could be subjected to an equal protection analysis because the "identity of the victim as elderly or handicapped is not relevant to proving the elements of armed robbery but is relevant to determining if the penalty enhancement [provision] applies"). Rather, here, although the habitual offender act "relates only to sentencing enhancement for the underlying felony," *People v. Edwards,* 971 P.2d 1080, 1081 (Colo.App.1998), it also provides different gradations of sentence enhancement, composed of different elements, depending on the nature of a defendant's prior felony convictions, *see* § 18–1.3–801(1)–(2.5). Defendant's contention is also somewhat analogous to a contention that the habitual offender sentencing scheme, as applied, violates equal protection when a defendant receives a "greater penalty" under the scheme despite having a "less culpable intent" and having caused "a less grievous result." *See Suazo,* 867 P.2d at 164; *see also Smith,* 852 P.2d at 422 (holding that a statutory scheme violates equal protection because it created a classification under which an offender acting with a "less culpable" mental state was subjected to a "more severe" sentence than an offender acting with a more culpable mental state). However, defendant does not frame his contention on appeal in such terms or reference the cases cited above. Accordingly, in our view, defendant's contention lies somewhere in the amorphous middle between a traditional equal protection claim and a claim attacking the validity of a sentencing enhancement scheme. *See Harper,* 111 P.3d at 484 (noting that "irrational penal classifications may still violate a defendant's right to equal protection and due process").

¶ 30 In any event, we need not decide this specific issue, because, even assuming that defendant's contention satisfies the "similarly situated" threshold test for an equal protection claim, we nevertheless conclude that the habitual offender act, as applied to him, has a rational basis and, therefore, does not violate his equal protection rights.

¶ 31 In our view, the General Assembly could rationally conclude that defendants who are convicted of a class 1 or class 2 felony, or a class 3 felony that is a crime of violence, and who have previously sustained two such convictions, should be sentenced to life imprisonment, rather than a term of years. Similarly, the General Assembly could rationally conclude that defendants who are convicted of any felony, and who have previously sustained three such convictions, should be sentenced to four times the presumptive maximum sentence for the underlying felony offense, rather than requiring the imposition of a life sentence. *See People v. Gutierrez,* 622 P.2d 547, 555 (Colo.1981) (holding that an earlier version of the habitual offender act had a rational basis because the "statutory scheme reflects progressively increasing penalties for a person who evidences an unwillingness or inability to reform and poses an attendant risk to society"). We also conclude that, as applied to defendant, under section 18–1.3–802(2), the General Assembly could rationally determine that he face a potentially longer time until parole eligibility than a defendant sentenced under section 18–1.3–801(1), because his habitual offender sentence was based on three prior convictions rather than two. *Gutierrez,* 622 P.2d at 555.

¶ 32 Moreover, the General Assembly's decision to extend parole eligibility to defendants sentenced to life imprisonment after serving at least forty years, rather than after a percentage of time has elapsed, is rational, because assigning a percentage of time to a life sentence as a way to compute parole eligibility would be unworkable, given that the length of a life sentence necessarily depends on how long an inmate lives.

¶ 33 The fact that defendant here received a mandatory ninety-six-year sentence, which he characterizes on appeal as an "effective life sentence" because "[t]here has been no case of an incarcerated inmate living to be 100 years old anywhere in the United States," does not compel a different conclusion. At the outset, we note that there is no evidence in the record supporting defendant's contention. Further, in our view, the fact that defendant's ninety-six-year sentence

could be characterized as effectively a "life sentence" is immaterial. In the context of Eighth Amendment claims brought in non-capital cases, courts do not consider a defendant's age when making sentencing decisions. *See People v. Cisneros,* 855 P.2d 822, 826 (Colo.1993) (rejecting an argument that the defendant was entitled to an extended proportionality review of his sentence under the Eight Amendment because, given his age and life expectancy, he was effectively sentenced to life imprisonment without the possibility of parole); *People v. Smith,* 848 P.2d 365, 375 (Colo.1993). We find this reasoning persuasive and applicable here.

¶ 34 Defendant's contention that the habitual offender act violates his right to equal protection because he will have to serve seventy-two years, as opposed to only "at least forty," before he is eligible for parole, also ignores the fact that he is only "eligible" for parole after serving seventy-two years. Inmates, including defendant, have no right to parole and no guarantee that they will be released from prison before expiration of their sentences. *Greenholtz,* 442 U.S. at 7, 99 S.Ct. 2100; *Andretti,* 779 P.2d at 384. Moreover, the Colorado parole board's decision to grant or deny a defendant parole is wholly within its discretion and not subject to review. *See White v. People,* 866 P.2d 1371, 1373 (Colo.1994) (parole board's decision is "plenary" and is not subject to judicial review); *In re State Judicial Review of Parole Denial,* 199 Colo. 463, 465–66, 610 P.2d 1340, 1341–42 (1980) (parole board's decision to grant or deny parole is not subject to judicial review). Accordingly, we conclude that the habitual offender act, as applied to defendant, has a rational basis and, therefore, does not violate his equal protection rights.

¶ 35 The supreme court's opinion in *People v. Alexander,* 797 P.2d 1250 (Colo.1990), although not directly on point, is nevertheless analogous, instructive, and supportive of our conclusion here. In *Alexander,* the defendant was sentenced under the then-existing habitual offender act to fifty years in prison and would be eligible for parole after approximately twenty-three years. *Id.* at 1253–54. By contrast, a defendant sentenced to life imprisonment under the then-existing statutory scheme would be eligible for parole after serving twenty years. *Id.* at 1254. The defendant contended that the then-existing statutory sentencing scheme violated his right to equal protection because "the parole board may, in its discretion, release a prisoner serving a life sentence after that prisoner has served less time than the defendant will have served before he may be considered for parole." *Id.* at 1255. The supreme court summarily rejected the defendant's contention and, as pertinent here, held that the statute met the rational basis test:

> The defendant's argument is without merit because the statutory scheme which gives the parole board discretionary power to grant parole on the basis of factors other than the length of the prisoner's sentence is reasonably related to a legitimate government interest.

*Id.* Similarly, here, the broad discretion allocated by statute to the parole board regarding parole decisions militates against defendant's equal protection claim.

¶ 36 Accordingly, we conclude that defendant has failed to demonstrate beyond a reasonable doubt that the habitual offender act, as applied to him, violates his constitutional guarantee of equal protection of the laws.

### III. Evidence of Prior Drug Use

¶ 37 Defendant next contends that the trial court abused its discretion and committed reversible error by admitting evidence of his prior drug use. We disagree.

¶ 38 Under CRE 404(b), evidence of other crimes, wrongs, or acts is inadmissible if its relevance depends on an inference that the person has a bad character and acted in conformity with that character. *People v. Spoto,* 795 P.2d 1314, 1318 (Colo. 1990). A trial court's decision to admit evidence under CRE 404(b) is reviewed only for an abuse of discretion. *Masters v. People,* 58 P.3d 979, 996 (Colo.2002). A court's decision to admit other act evidence will not be overturned unless the ruling is manifestly arbitrary, unreasonable, or unfair. *Kaufman v. People,* 202 P.3d 542, 553 (Colo.2009).

## A. Procedural History

¶ 39 Before trial, defendant filed a motion objecting to the introduction of other acts evidence despite having not received notice from the prosecution that it intended to introduce such evidence. Subsequently, the prosecution filed its notice of intent to introduce other acts evidence at trial and, as pertinent here, specifically sought admission of three incidents of defendant's prior drug use: (1) an incident where defendant showed up at the victim's apartment, before defendant began living there, and stated that he was looking for an "eight ball," or an eighth ounce of crack cocaine; (2) an incident when defendant was using crack cocaine at a party during which he confessed to a former friend that he murdered the victim; and (3) the 2001 incident in which defendant beat the victim over the perceived theft of a small amount of crack cocaine. Regarding the 2001 incident, on appeal, defendant does not challenge the court's ruling on the ground that admission of testimony about the 2001 assault itself violated CRE 404(b). Rather, defendant contends that the court abused its discretion by admitting this evidence solely because it suggested defendant used crack cocaine.

¶ 40 In its notice of intent, the prosecution argued that evidence of defendant's prior crack cocaine use, as well as defendant's 2001 beating of the victim over the perceived theft of a small amount of crack, was admissible under CRE 404(b) to show defendant's "motive, intent, opportunity, preparation, plan, knowledge and identity." However, the prosecution's substantive argument focused on the more limited purposes of "motive" and "identity." Specifically, the prosecution argued that the evidence tended to explain defendant's motive for killing his "best friend" (a possible dispute over crack cocaine) and tended to establish defendant's identity as the perpetrator and refute defendant's theory of defense that he was not in the apartment when the victim was killed and dismembered.

¶ 41 At a pretrial motions hearing, the court performed a thorough analysis of the proffered evidence under the four-part *Spoto* test, and ruled that evidence of defen-

dant's prior use of crack cocaine would be admissible at trial for the limited purpose of establishing defendant's identity as the perpetrator "because of the presence and the existence of the crack pipes at the home the night of the fire." The court also ruled that evidence of defendant's prior assault on the victim would be admissible "because it provides identity information, who would beat this man to death and then dismember him," and also "intent information with this defendant associated with [the victim]."

¶ 42 At trial, before each witness testified regarding defendant's prior crack cocaine use, the court gave the jury a limiting instruction in which it was instructed that it should consider the evidence only for the limited purposes "of showing either identity or intent" and for no other purpose and that defendant "was entitled to be tried for the charge in this case and no other." The court similarly instructed the jury in its written instructions after the close of evidence.

## B. Analysis

¶ 43 On appeal, defendant contends the trial court erred in its rulings regarding admission of all three instances of defendant's prior use of crack cocaine. We examine the admission of the evidence relating to the three incidents, and reject defendant's contentions as to each of them in turn.

### 1. The "Eight Ball" Incident

¶ 44 First, defendant contends that the trial court abused its discretion by admitting testimony from the victim's former girlfriend that defendant appeared at the victim's apartment looking for an "eight ball." We disagree.

¶ 45 After the trial court gave the jury the appropriate limiting instruction, the following colloquy took place between the prosecution and the victim's former girlfriend:

[Prosecution:] [W]hat is it that [defendant] comes to the house ... looking for?

[Former girlfriend:] An eight ball.

[Prosecution:] What's an eight ball?

[Former girlfriend:] An eight ball is an eighth of an ounce of crack cocaine.

[Prosecution:] Did [the victim] give it to him that you're aware of?

[Former girlfriend:] No.

[Prosecution:] Does there come a time when [defendant] starts coming to the house . . . more often?

[Former girlfriend:] Yes.

The former girlfriend then described the increasing amount of time defendant and the victim spent together until, eventually, defendant and the victim began living together in the victim's apartment.

¶ 46 We perceive no abuse of discretion in the court's decision to admit this testimony. We agree with the trial court that this testimony was logically relevant to material facts in the case independent of the prohibited inference under CRE 404(b) that defendant killed the victim because defendant was a bad person who bought "eight balls." The evidence was relevant both to intent and identity, because it explained the nature of defendant's relationship with the victim and the progression by which defendant came to live with the victim, and it tended to connect defendant to the apartment because of the crack cocaine pipes found there after the fire. Also, the probative value of the testimony was not substantially outweighed by the danger of unfair prejudice because the testimony was brief, conveyed relatively mundane information when compared with the graphic evidence otherwise admitted at trial, and was accompanied by a proper limiting instruction. *See* CRE 403; *People v. Villa*, 240 P.3d 343, 352 (Colo.App.2009); *see also People v. Rincon*, 140 P.3d 976, 980 (Colo.App.2005) (finding harmless error where impermissible reference to defendant's drug activity was brief).

### 2. The "Party" Incident

¶ 47 Second, defendant contends that the trial court abused its discretion by admitting testimony by his former friend that defendant used drugs at a party during which he confessed to killing the victim. We disagree.

¶ 48 Defendant's former friend testified about a party he hosted at which he, his ex-wife, and defendant made and used crack cocaine. During his testimony, and after the court gave the jury the appropriate limiting instruction, the following colloquy took place:

[Prosecution:] When I asked you about who was doing the powder cocaine, were you and your wife doing that that night?

[Former friend:] Yes, ma'am.

[Prosecution:] And then, given the Court's [limiting] instruction, was [defendant] sharing in that as well?

[Former friend:] Yes, ma'am.

The former friend then described a conversation among him, his ex-wife, and defendant. At one point, the ex-wife asked defendant if he had ever killed a person, and defendant admitted to beating the victim to death. Defendant does not challenge the admission of this confession. Rather, he challenges the admission of the testimony above implicating him in drug use.

¶ 49 We perceive no abuse of discretion. The logical relevance of defendant's intoxicated state of mind at the time he made the confession did not depend on an inference that defendant killed the victim because he was a bad person who used drugs. Rather, the testimony was relevant to explain the nature of defendant's confession, provide the context in which defendant made the confession, and establish defendant's use of crack cocaine, which tended to connect him to the crack pipes found in the victim's apartment. Further, the probative value of the evidence was not substantially outweighed by the danger of unfair prejudice because the reference to defendant's drug use was brief and was preceded by a proper limiting instruction. *See* CRE 403; *Villa*, 240 P.3d at 352; *see also Rincon*, 140 P.3d at 980.

### 3. The Incident Related to the 2001 Assault

¶ 50 Third, defendant contends that the trial court abused its discretion by admitting testimony from the victim's sister that defendant provided the victim with drugs, and that defendant and the victim regularly smoked crack cocaine together. Again, we disagree.

¶ 51 Here, after the court gave the jury its limiting instruction, the following colloquy

took place between the prosecution and the victim's sister:

> [Prosecution:] When your brother [the victim] would use drugs, would you see where he would get those drugs from?
>
> [Victim's sister:] From [defendant].
>
> . . . .
>
> [Prosecution:] How often do you think you saw your brother, if you can guess, get drugs from [defendant]?
>
> [Victim's sister:] Daily.
>
> [Prosecution:] And when he would get—how would he use those drugs?
>
> [Victim's sister:] Smoke.
>
> [Prosecution:] What would he use to smoke?
>
> [Victim's sister:] A glass pipe.

¶ 52 Following another limiting instruction by the court relating specifically to the 2001 assault, the victim's sister then testified that she witnessed defendant beat the victim by kicking him in his face and head, even after the victim lost consciousness, over the perceived theft of a small amount of crack. Defendant did not object at trial to the admission of the sister's testimony describing the prior assault, nor does he challenge the admissibility of that testimony on appeal. Rather, he challenges the admission of the testimony above implicating him in drug use.

¶ 53 We perceive no abuse of discretion in the admission of this testimony. The testimony about defendant's providing drugs to the victim and using drugs with the victim was necessary to provide context to the 2001 beating of the victim, to explain the circumstances under which the beating took place, and to provide the jury with a complete understanding of the events surrounding the beating. See People v. Griffiths, 251 P.3d 462, 466 (Colo.App.2010); People v. Young, 987 P.2d 889, 893–94 (Colo.App.1999). Without this context, the testimony would have been confusing and invited speculation on the part of the jury. Moreover, as with the other two incidents, the evidence was logically relevant both to identity and intent because of the crack cocaine connection between defendant and the victim. Further, the probative value of the evidence was not substantially outweighed by the danger of unfair prejudice because the testimony was brief, cumulative of previously admitted testimony about defendant's drug use, and preceded by a proper limiting instruction. See CRE 403; Griffiths, 251 P.3d at 466–67.

¶ 54 Thus, in sum, we reject defendant's contention that the court abused its discretion by admitting evidence of defendant's prior crack cocaine use.

## IV. Mittimus

¶ 55 Finally, defendant contends, the People concede, and we agree that the mittimus mistakenly states that defendant was convicted of first degree murder. Defendant was convicted of second degree murder only. Accordingly, we remand to the trial court for correction of the mittimus to delete the language reflecting a conviction for first degree murder.

¶ 56 The judgment and sentence are affirmed, and the case is remanded with directions to correct the mittimus.

Judge HAWTHORNE and Judge MILLER concur.