2014 COA 54

**The PEOPLE of the State of Colorado, Plaintiff–Appellee,**

**v.**

**Anthony Louis PAGLIONE, Defendant–Appellant.**

**Court of Appeals No. 12CA1664**

Colorado Court of Appeals, Div. V.

Announced April 24, 2014

Pueblo County District Court No. 09CR1585, Honorable David W. Crockenberg, Judge

John W. Suthers, Attorney General, Carmen Moraleda, Assistant Attorney General, Denver, Colorado, for Plaintiff–Appellee

Darol C. Biddle, Pueblo, Colorado, for Defendant–Appellant

Opinion by JUDGE BERGER

¶ 1 Defendant, Anthony Louis Paglione, appeals the judgment of conviction entered on a jury verdict finding him guilty of theft of twenty thousand dollars or more. We affirm.

## I. Background

¶ 2 Defendant is a mortgage broker and banker. In November 2005, defendant helped the victim refinance his house to obtain cash needed to purchase a second house, which he intended to use as a rental property.

¶ 3 In March 2006, the victim took out a home equity loan on the rental property to pay down his mortgage on his primary residence so that his mortgage liability would be redistributed equally between his two houses. Defendant also assisted the victim with this home equity loan transaction. The proceeds from the home equity loan were approximately $76,000.

¶ 4 Defendant arranged for the victim to make payments on both mortgages directly to defendant, who represented that he was an agent for the mortgage lender. The lender mailed the victim's statements to defendant's business address. When the victim requested statements, defendant generated his own receipts and statements for the victim, rather than providing copies of the lender's statements.

¶ 5 In February 2008, the victim attempted to pay the remaining balance of both loans in the amount that he believed was outstanding, after accounting for the $76,000 that he thought had been applied to the mortgage on his primary residence. He later discovered that the mortgages had not been fully paid, and he reported defendant to the police for theft.

¶ 6 At trial, defendant testified that he had received the victim's money from the March 2006 home equity loan but did not apply it to the mortgage on the victim's primary residence. His explanation was that the victim loaned him the $76,000 in a transaction outside of the March 2006 home equity loan closing. Defendant claimed that the supposed loan transaction was evidenced by a promissory note that he had signed and given to the victim, although he was able to produce only an unsigned copy of the note. Defendant also testified that he had paid interest on the note directly to the victim from June until August 2006, and thereafter to the victim's mortgage lender. The victim testified that no such loan arrangement existed and that he had never seen the note before legal proceedings were commenced against defendant.

¶ 7 Based on the alleged loan transaction involving the $76,000 proceeds from the home equity loan, defendant argued that he and the victim had a debtor-creditor relationship. He admitted at trial that he had been unable to pay the balance of the loan when the victim called the note, but argued that his inability to repay the victim was a civil dispute, not a crime.

¶ 8 After a four-day trial, the jury found defendant guilty of theft of twenty thousand dollars or more. The trial court sentenced defendant to five years of probation.

## II. Defendant's Right to Present Evidence and Use Immunity

¶ 9 Defendant contends that (1) he was denied his constitutional rights to a fair trial and to present evidence on his own behalf and (2) the trial court erred by not requiring the prosecutor to request use immunity for a defense witness.

### A. Trial Court Proceedings

¶ 10 Defendant called to testify a former employee of the title company who was the loan closer at the March 2006 closing of the home equity loan. After the witness was sworn, the prosecutor asked for a bench conference. The following colloquy occurred:

[Prosecutor]: [The loan closer] needs to be advised of her Fifth Amendment Rights if she is going to testify that she notarized those documents. [The victim] is prepared to testify that she wasn't there when he signed those documents.

[Defense counsel]: Are you threatening her with prosecution?

[Prosecutor]: No. I think she needs to have an attorney to advise her if she is going to testify.

[Defense counsel]: If you are planning on prosecuting, it's past the statute of limitations.

The Court: All right. Let's talk to her in chambers. Let's send the jury out for a while.

¶ 11 The court then retired to chambers with the witness and counsel. The following additional colloquy occurred:

[Prosecutor]: Your Honor, if she plans to testify that she notarized the document from [the March 2006 closing] as the notary—it does state that she notarized it on 4-18—or, excuse me, she did notarize it. [The victim] and [the victim's father] are prepared to testify that she was not in the room when they signed the documents. There was a heavier lady, Mr. Paglione, and just the two of them. She was not present when the documents were signed. They've never met her and they don't know who she is.

The Court: So what would she be subjected to?

[Prosecutor]: Perjury first and foremost.

[Defense counsel]: What?

[Prosecutor]: Perjury.

The Court: It's a Class 4—

[Defense counsel]: It'll take more than one witness to establish perjury.

The Court: It's a Class 4 felony.

[Prosecutor]: Yes, sir.

The Court: I don't know if it's true. [Loan closer], I need to advise you and give you a chance to think about your testimony. If what the prosecutor is saying is correct, that could possibly expose you to a Class 4 felony.

The court then advised the loan closer of the possible penalties for a first degree perjury conviction.

¶ 12 The court offered to appoint counsel for the loan closer, and she agreed. After that consultation, her counsel informed the court that the loan closer would exercise her Fifth Amendment right and would refuse to testify. The loan closer was then excused as a witness without giving any substantive testimony.

¶ 13 Defendant objected to the perjury warning and also argued that the prosecutor "should have done something long before trial." The prosecutor responded that she had told defense counsel before trial that she was not planning on calling the loan closer because she anticipated that, if called, the loan closer would assert her Fifth Amendment right against self-incrimination. Neither defendant nor the prosecutor raised this issue with the court before trial. Nor does it appear that the prosecutor told defense counsel that she would request a perjury warning if the loan closer was called by the defense and testified. Defendant's motions for a mistrial and for judgment of acquittal were denied.

### B. Defendant's Right to Present Evidence

¶ 14 Intentional, concerted effort by the prosecution to deprive a defendant of exculpatory testimony through witness intimidation may deprive the defendant of a fair trial. *People v. Blackwell*, 251 P.3d 468, 472 (Colo.App.2010); *People v. Weddle*, 652 P.2d

1111, 1112 (Colo.App.1982). Unnecessarily strong admonitions against perjury aimed at discouraging defense witnesses from testifying may deprive a criminal defendant of the defendant's Sixth Amendment right to present witnesses. *Blackwell*, 251 P.3d at 472. Comments amounting to a threat beyond what the record indicates is necessary and appropriate may suggest the prosecutor sought to coerce a witness into silence. *Id.*

¶ 15 In our system of justice, the ordinary mechanisms by which truthful testimony is distinguished from false testimony are cross-examination and the fact-finder's application of common sense principles that ordinary persons use to determine the truth or falsity of a statement or matter. *See* COLJI–Crim. 3:06 (1993) (listing factors that jurors may consider when determining the credibility of a witness); *see also State v. Feaster*, 184 N.J. 235, 877 A.2d 229, 245 (2005) ("We have confidence that our courts and juries are capable of detecting falsehoods with the aid of the adversarial process.").

¶ 16 The use of perjury warnings by a prosecutor and perjury advisements by a court have a substantial potential of skewing the truth-finding process by deterring witnesses from giving relevant testimony. *See Feaster*, 877 A.2d at 245 (perjury warnings do "not advance the truth-seeking function of a trial"). While we agree with the *Blackwell* court and other courts that have addressed the issue that "[p]erjury warnings are not per se improper and may be appropriate," 251 P.3d at 473, we caution that such warnings should be the exception, not the rule. *Cf. People v. Shapiro*, 50 N.Y.2d 747, 431 N.Y.S.2d 422, 409 N.E.2d 897, 905 (1980) (explaining that notwithstanding a prosecutor's obligation to warn potential witnesses of their possible liability for false statements under oath, perjury warnings must not be used as "instruments of intimidation"). This is because of the vast disparity in power between the prosecution and the defense in this area. Only the prosecution has the power to make good on a prosecution threat; the defense is powerless to prosecute a prosecution witness for perjury. And, under Colorado law, as addressed more fully below, only

the prosecutor has the power to request the court to grant immunity to a witness.

¶ 17 We examine the totality of the circumstances to determine whether the prosecution's actions constituted substantial governmental interference with a defendant's right to present a defense. *Blackwell*, 251 P.3d at 472. Among the factors we consider are (1) the manner in which the prosecutor raises the issue, including the warning's extent and timing, the language employed, and whether the prosecutor communicated directly with the witness or through an attorney; (2) the prosecutor's basis in the record for believing the witness might lie; (3) the warning's effect on the witness's willingness to testify; (4) whether the court attempted to remedy any misconduct; and (5) whether the prosecutor capitalized on the witness's absence by directing the jury's attention to it during closing arguments. *Id.*

¶ 18 We also consider an additional factor, not discussed in *Blackwell*: (6) the significance of the witness's testimony to the defense. *See Griffin v. Davies*, 929 F.2d 550, 553 (10th Cir.1991) (explaining that "[t]here must be a plausible showing that an act by the government caused the loss ... of testimony that was both *material and favorable* to the defense" to establish a due process violation based on the denial of the right to compulsory process) (emphasis added); *United States v. Weddell*, 800 F.2d 1404, 1410–11 (5th Cir.1986) (explaining that to establish a due process violation, a defendant must show that the government's interference with the defendant's right to call a witness prejudiced his or her defense).

¶ 19 We address each factor in turn.

### 1. Manner in Which the Prosecutor Raised the Issue

¶ 20 The record demonstrates that the prosecution threatened the loan closer with a perjury prosecution if she testified. To the extent the People argue that no threat was made, we reject that contention. In our view, any reasonable witness would have perceived the prosecutor's words and actions as a threat of prosecution. In fact,

the court observed that the witness was "visibly upset" as a result of these developments.

¶ 21 We recognize that many, if not most, perjury warnings, no matter how carefully phrased, may reasonably be construed by the witness to constitute a threat of perjury prosecution. Even so, because we agree with the division in *Blackwell* that perjury warnings may be appropriate in some circumstances, we cannot say that such perceptions alone will render perjury warnings improper. Consequently, that a perjury warning will often, if not always, be perceived as a threat of prosecution is not dispositive of whether the prosecutor's conduct was improper.

¶ 22 Moreover, we acknowledge that the ABA Standards for Criminal Justice address when a prosecutor should "advise the witness concerning possible self-incrimination and the possible need for counsel." ABA Standard for Criminal Justice 3–3.2 (1993) provides:

(b) A prosecutor should advise a witness who is to be interviewed of his or her rights against self-incrimination and the right to counsel whenever the law so requires. It is also proper for a prosecutor to so advise a witness whenever the prosecutor knows or has reason to believe that the witness may be the subject of a criminal prosecution. However, a prosecutor should not so advise a witness for the purpose of influencing the witness in favor of or against testifying.

¶ 23 The Commentary to the ABA Standard states:

[T]he prosecutor has a professional obligation to advise witnesses of their right to counsel and other applicable constitutional rights, such as the right against self-incrimination when prevailing constitutional, statutory, or decisional law in the prosecutor's jurisdiction so requires.

¶ 24 No Colorado Supreme Court case has explicitly adopted ABA Standard 3–3.2 or held that prosecutors have such an obligation. *See People v. Rubanowitz*, 688 P.2d 231, 247–48 (Colo.1984) (discussing but not adopting ABA Standard 3–3.2). The Colorado Rules of Professional Conduct also contain no such requirement. *See* Colo. RPC 3.8 (Special Responsibilities of a Prosecutor). Our conclusion that a perjury warning should be the exception and not the rule, therefore, is consistent with a prosecutor's professional obligations under Colorado law.

¶ 25 The Commentary to Standard 3–3.2 also supports this conclusion. The Commentary states that:

It is ... inappropriate and unprofessional for a prosecutor who is not required by law to provide such advice to witnesses to do so simply for the purpose of influencing them for or against testifying in a criminal proceeding, e.g., by unduly scaring them into believing that if they testify they may incriminate themselves and may, as a result, face subsequent prosecution.

When the text of Standard 3–3.2 is considered in conjunction with the Commentary, Standard 3–3.2 is consistent with our analysis.

¶ 26 But if the prosecutor decides to advise or request the court to advise a witness regarding the potential consequence of testifying, notwithstanding the witness's perception of the warning as a threat, the manner in which the prosecutor raises the issue will influence the determination of whether doing so was proper.

¶ 27 The prosecutor raised the issue of possible perjury by the loan closer after she was sworn, and the perjury warning was given outside of the jury's presence. All communications with the loan closer were through counsel or the court. The perjury warning itself, though surely of concern to the witness, did not constitute an "[u]nnecessarily strong admonition[ ] against perjury." *Blackwell*, 251 P.3d at 472. In sum, we conclude that the perjury warning was given in an appropriate manner.

2. The Prosecutor's Basis in the Record for Believing the Witness Might Lie

¶ 28 The only basis in the record for the prosecutor's belief that the loan closer might lie was that the victim, and perhaps the victim's father, would testify that the loan closer was not present at the home equity loan closing and therefore could not have

explained any of the documents presented at the closing to the victim. We conclude that this was an insufficient basis upon which to predicate a perjury warning.

¶ 29 In many trials, witnesses to an event may have vastly different recollections. This is human nature, not mendacity. It does not necessarily mean that any witness has committed perjury.

¶ 30 A prosecutor may firmly believe in the truthfulness of the prosecution witnesses presented at trial, and thus may also believe that any witness who gives conflicting testimony is lying. But such a belief does not warrant a perjury warning. Conflicting testimony or anticipated testimony will rarely rise to the level that justifies a perjury warning. *See United States v. Vavages*, 151 F.3d 1185, 1190 (9th Cir.1998) ("That [the witness's] testimony would have contradicted the testimony of the government's own witnesses does not form a sufficient basis for the prosecutor's warning.").

¶ 31 Conversely, independent, objective evidence of a witness's likelihood to commit perjury may make a perjury warning appropriate. Such objective evidence includes documentary or electronic evidence that renders the anticipated testimony very likely false (such as an audio or video recording of relevant events); credible expert testimony that demonstrates that the witness's anticipated testimony is false (such as ink dating analysis); or prior inconsistent statements by a witness. *See Vavages*, 151 F.3d at 1190 ("[U]nusually strong admonitions against perjury are typically justified only where the prosecutor has a more substantial basis [than conflicting testimony] in the record for believing the witness might lie—for instance, a direct conflict between the witness'[s] proposed testimony and her own prior testimony.").[1]

### 3. The Effect of the Warnings on the Witness's Willingness to Testify

¶ 32 We conclude that the prosecutor's perjury threat and the court's perjury

advisement were but-for causes of the loan closer's refusal to testify. Still, the ultimate decision by the witness not to testify was made only after she had the benefit of legal counsel, who advised her not to testify, as was her constitutional right. Under these circumstances, we cannot conclude that the perjury warning or perjury advisement, in the end, caused the loan closer not to testify. *But see id.* at 1191 (explaining that although a "defendant may not be prejudiced by a prosecutor's improper warnings where counsel for a witness strips the warnings of their coercive force," in that case, "the prosecutor's admonitions were 'a very determining factor' in counsel's decision to advise [the witness] not to testify").

### 4. Whether the Court Attempted to Remedy any Misconduct

¶ 33 The trial court did not find that there was any misconduct by the prosecutor. Nor do we. The court did, as explained above, appoint counsel for the loan closer. In our view, even if the prosecutor had acted improperly, the appointment of independent counsel for the witness, though not dispositive, is an important factor in applying the *Blackwell* test.

### 5. Whether the Prosecutor Capitalized on the Witness's Absence by Directing the Jury's Attention to it During Closing Arguments

¶ 34 During her rebuttal closing arguments, the prosecutor included the loan closer in a list of witnesses related to defendant whom he called to testify on his behalf. However, this reference was made in response to defendant's argument challenging the credibility of the prosecution's witnesses; the prosecutor did not point out that the loan closer did not testify. Thus, we conclude that the prosecutor did not capitalize on the loan closer's absence during closing arguments.

---

1. We recognize that neither the prosecutor nor the trial court had the benefit of our opinion when the prosecutor requested the perjury warning. The prosecutor may well have believed that

the existence of two witnesses who would testify that the loan closer was not present at the closing was sufficient to justify a perjury warning.

### 6. The Significance of the Witness's Testimony to the Defense

¶ 35 Had the loan closer testified that the promissory note was presented at the closing (or even existed), such testimony would have been highly relevant because the existence of the note was disputed; the prosecution asserted throughout trial that defendant had invented the note to cover up the crime, while defendant claimed, as his sole defense, that there was a bona fide loan transaction between himself and the victim that precluded criminal liability.

¶ 36 But defendant testified that the note was *not* part of the closing at which the loan closer allegedly presided. Rather, according to defendant's testimony, the loan transaction between the victim and defendant was handled outside the closing. Thus, any testimony by the loan closer about closing the loan logically could not have confirmed the existence of the note. Similarly, defense counsel, in making an offer of proof during the in-chambers conference, did not state that the loan closer would testify regarding either the existence of the note or the alleged separate loan transaction between the victim and defendant.

¶ 37 We recognize that the loan closer's anticipated testimony may have been relevant to challenge the credibility of the victim. The victim testified that no explanation of the documents he signed was given to him at the closings. The title closer for the November 2005 refinancing of the victim's house testified that she explained the documents at that closing to the victim, thus impeaching the victim's credibility in that regard. Had the loan closer testified that she explained the documents at the home equity closing that, too, would have impeached the victim's credibility. The credibility of the victim and defendant were important issues in this case. But the probative value of testimony by the loan closer concerning the existence of the note—testimony which she logically could not have given—stands on an entirely different footing than general impeachment testimony. The record already contained a substantial amount.

¶ 38 After considering all of the above factors, we conclude that defendant failed to establish by a preponderance of the evidence that the government improperly interfered with the loan closer's choice to testify or deprived the defendant of due process of law. *See Blackwell*, 251 P.3d at 472.

### C. Use Immunity

¶ 39 After the prosecutor requested the perjury advisement and the court advised the loan closer of the possible consequences of perjury, the defense requested that the court grant immunity to the loan closer or, alternatively, order the prosecutor to request immunity for the loan closer pursuant to section 13–90–118, C.R.S.2013. The court denied the request to grant immunity to the loan closer on the basis that it had no power to do so. The prosecutor also denied the request, stating that it would be "inappropriate" to grant immunity.

¶ 40 A prosecutor may request an order from the trial court requiring a witness to testify in a criminal case despite the witness's refusal to testify on the basis of his or her privilege against self-incrimination, when, in the judgment of the prosecutor, the witness's testimony may be necessary to the public interest. § 13–90–118. The prosecution has "considerable discretion in determining when to request use immunity for a witness." *People v. Russom*, 107 P.3d 986, 992 (Colo.App.2004).

¶ 41 Upon a request by the prosecutor, the trial court has discretion to grant immunity to a witness. *Id.* However, the trial court possesses no authority to order the prosecutor to make such a request, nor does it have the authority to grant immunity on its own initiative or at the request of the defense. *Harding v. People*, 708 P.2d 1354, 1358 (Colo.1985); *People v. Eggert*, 923 P.2d 230, 233 (Colo.App.1995) (because the prosecutor did not request immunity, the trial court had no authority to grant the defendant's request for immunity for the defendant or a defense witness).

¶ 42 We thus reject defendant's argument that the trial court erred when it did not require the prosecutor to give the loan closer use immunity. *See Eggert*, 923

P.2d at 233. Additionally, for the reasons discussed above, nothing in the record indicates that "the truth-finding process was deflected by the failure to grant immunity" to the loan closer, especially because her testimony was cumulative and not essential to defendant's defense. *Harding*, 708 P.2d at 1358. Defendant was therefore not denied fundamental fairness or due process. *See id.*

¶ 43 Accordingly, we conclude that defendant was not denied his constitutional rights to a fair trial and to present evidence on his own behalf.

### III.  Jury Instructions

¶ 44 Defendant contends that the trial court erred when it refused to instruct the jury that failure to pay a debt does not constitute a crime. We reject this contention.

### A.  Law

¶ 45 A trial court has a duty to correctly instruct the jury on the law applicable to the case. *Riley v. People*, 266 P.3d 1089, 1092 (2011); *People v. Doubleday*, 2012 COA 141, ¶ 38, — P.3d —. We review de novo the jury instructions as a whole to determine whether the instructions accurately informed the jury of the governing law. *Riley*, 266 P.3d at 1092. If they do, we then review the trial court's decision to give (or not give) a particular jury instruction for an abuse of discretion. *People v. Wylie*, 260 P.3d 57, 59 (Colo.App.2010). A trial court abuses its discretion when its decision is manifestly arbitrary, unreasonable, or unfair. *People v. Stewart*, 55 P.3d 107, 122 (Colo. 2002).

### B.  Analysis

¶ 46 Defendant does not contend that the trial court erroneously instructed the jury on the elements of theft. Rather, defendant argues that the court erred when it (1) removed a sentence from his tendered theory of defense instruction before it was given to the jury and (2) rejected his second tendered instruction.

¶ 47 The court instructed the jury:

It is [defendant's] contention that the transaction between the parties created a debtor-creditor relationship whereby [the victim] loaned $76,334.26 to [defendant] and that this relationship was evidenced by a promissory note and by payments of interest to [the victim] by [defendant].

¶ 48 This instruction was tendered by defendant with an additional sentence that stated: "If you entertain a reasonable doubt regarding this issue you must return a verdict of Not Guilty." Defendant argues that without this sentence, his theory of defense instruction is "meaningless." We reject this argument because the court properly instructed the jury on the burden of proof in a separate instruction. And because the instructions as a whole accurately informed the jury of the governing law, the court did not abuse its discretion when it instructed the jury on defendant's theory of defense. *See People v. Smoots*, 2013 COA 152, ¶ 5, — P.3d —; *Wylie*, 260 P.3d at 59.

¶ 49 The court rejected defendant's second proffered theory of defense instruction, which stated:

Colorado law provides that there shall be no imprisonment or arrest for debt in this state in any case upon any contract, expressed or implied.

Therefore, one who fails to pay a debt arising from his failure to perform a contractual obligation may not be convicted of a crime.

¶ 50 The court did not abuse its discretion when it rejected this instruction. The court properly instructed the jury on defendant's theory of defense that the transaction created a debtor-creditor relationship in the first instruction. In addition, the court properly instructed the jury on the elements of theft. And again, because the instructions as a whole accurately instructed the jury on the governing law, the court did not abuse its discretion when rejecting this tendered instruction. *See Wylie*, 260 P.3d at 59.

### IV.  Challenge for Cause

¶ 51 Defendant contends that the trial court erred when it denied his challenge for

cause to a prospective juror who allegedly knew the victim and his family's business. We reject this contention.

¶ 52 A trial court must sustain a challenge for cause when a state of mind exists in the juror evincing enmity or bias toward the defendant or the state. *People v. Blessett*, 155 P.3d 388, 391 (Colo.App.2006).

¶ 53 We review a trial court's denial of a challenge for cause for an abuse of discretion. *Carrillo v. People*, 974 P.2d 478, 485 (Colo.1999); *People v. Fleischacker*, 2013 COA 2, ¶ 7, — P.3d ——. The trial court has broad discretion over challenges for cause because it is in the best position to assess a potential juror's demeanor, credibility, and sincerity. *Fleischacker*, ¶ 7. A court abuses its discretion when its decision is manifestly arbitrary, unreasonable, or unfair. *Id.*

¶ 54 During voir dire, the trial court read a list of potential witnesses and asked the prospective jurors whether they knew any of the witnesses. Prospective juror, Ms. D, did not respond. Later, defense counsel asked whether any of the prospective jurors had been inside a particular store, which is the victim's family business. Ms. D did not respond.

¶ 55 After defense counsel discovered on Facebook that Ms. D may have known the victim, the court held an in camera hearing and questioned Ms. D about their relationship. Ms. D stated that her husband went to school with the victim but that she did not know him and would not recognize him if she passed him on the street. She also admitted that she shops at the victim's family business once a year at Christmas time. She said that she did not respond to defense counsel's questions, however, because she did not think any of this mattered since she did not know the victim or any other potential witnesses personally. She affirmed that she could be impartial, that she could fairly weigh the witnesses's testimony, and that she would base her decision on the evidence presented at trial.

¶ 56 Defendant challenged Ms. D for cause because she allegedly had been "less than candid" during voir dire. The court denied defendant's challenge, finding that Ms. D did not intentionally mislead the court and that she did not have a personal connection with the victim and his family. Defendant then used his remaining peremptory challenge to dismiss Ms. D from the jury.

¶ 57 The trial court did not abuse its discretion when it denied defendant's challenge for cause. The record supports its determination that Ms. D did not intentionally withhold information or mislead the court. And because the record does not indicate that Ms. D had a state of mind evincing enmity or bias toward defendant or the state, the court was not required to dismiss her for cause. *See Blessett*, 155 P.3d at 391.

¶ 58 Accordingly, we conclude that the trial court did not abuse its discretion when it denied defendant's challenge for cause.

## V. Juror Misconduct

¶ 59 We also reject defendant's contention that the trial court erred when it refused to conduct a hearing into alleged juror misconduct after trial because two jurors had not provided "candid answers" during voir dire about their relationships with the victim.

¶ 60 We evaluate a trial court's rulings on a claim of juror misconduct for an abuse of discretion. *People v. Thurman*, 948 P.2d 69, 71 (Colo.App.1997).

¶ 61 "A new trial may be required where a juror deliberately misrepresents or knowingly conceals information relevant to a challenge for cause or a p[er]emptory challenge." *People v. Christopher*, 896 P.2d 876, 878 (Colo.1995). However, when "a juror's nondisclosure was inadvertent, the defendant must show that the non-disclosed fact 'was such as to create an actual bias either in favor of the prosecution or against the defendant.' " *Id.* at 878–79 (quoting in part *People v. Dunoyair*, 660 P.2d 890, 896 (Colo.1983)). The defendant must also show that he or she was prejudiced by the alleged misconduct. *Thurman*, 948 P.2d at 71.

¶ 62 Defendant alleged that he learned after trial that two jurors had not been candid during voir dire. However,

contrary to defendant's allegation that the lack of candor affected the verdict in this case, neither juror served on the jury and participated in deliberations. As noted above, defendant used a peremptory challenge to excuse the first prospective juror, Ms. D, during voir dire. The second prospective juror, Ms. V, was not selected as a juror. Therefore, defendant cannot show that he was prejudiced by the alleged misconduct. *See id.*

¶ 63 Accordingly, the trial court did not err when it refused to conduct a hearing into the alleged juror misconduct after trial.

### VI. Cumulative Error

¶ 64 Because the trial court did not err, defendant's contention that the cumulative effect of such errors deprived him of a fair trial necessarily fails. *See Blackwell,* 251 P.3d at 477 (rejecting cumulative error argument after discerning no single error).

### VII. Conclusion

¶ 65 The judgment is affirmed.

JUDGE GRAHAM and JUDGE BERNARD concur.