23CA0176 Peo v Toler-Anderson 04-02-2026

COLORADO COURT OF APPEALS

---

Court of Appeals No. 23CA0176
El Paso County District Court No. 21CR3424
Honorable David A. Gilbert, Judge

---

The People of the State of Colorado,

Plaintiff-Appellee,

v.

Paris Toler-Anderson,

Defendant-Appellant.

---

JUDGMENT AFFIRMED

Division VI
Opinion by JUDGE YUN
Grove and Schock, JJ., concur

**NOT PUBLISHED PURSUANT TO C.A.R. 35(e)**
Announced April 2, 2026

---

Philip J. Weiser, Attorney General, Sonia Raichur Russo, Senior Assistant
Attorney General, Denver, Colorado, for Plaintiff-Appellee

Megan A. Ring, Colorado State Public Defender, Leah Scaduto, Deputy State
Public Defender, Denver, Colorado, for Defendant-Appellant

¶ 1     Paris Toler-Anderson appeals the judgment of conviction entered after a jury found him guilty of second degree murder and illegal discharge of a firearm.  He contends that (1) the district court erred by admitting other act evidence in violation of CRE 404(b); (2) the prosecution committed misconduct; and (3) the cumulative effect of these errors deprived him of a fair trial.  We disagree with these contentions and affirm the judgment.

## I.     Background

¶ 2     Toler-Anderson was residing at Community Alternatives of El Paso County (CAE), a community corrections facility, when he began a romantic relationship with the victim.  After he ended the relationship and reconciled with his previous girlfriend (his children's mother), the victim began threatening him and his family.

¶ 3     According to Toler-Anderson, the victim stalked both him and his girlfriend, brought armed men to his girlfriend's residence, attempted to run his girlfriend off the road, and threatened to have him shot.  The victim also threatened to cause "trouble" for him at CAE by reporting that she had been forging pay stubs for him when he was not employed.

¶ 4     On June 4, 2021, the victim texted Toler-Anderson, "I left your case manager the message" and "Bitch you're going to jail tonight." The next day, she texted him, "I'm not done with you yet[,] watch what I do next," and "I'm a take it out on your baby mama so you gonna have to kill me bitch."

¶ 5     On June 16, 2021, Toler-Anderson drove Jahlique Dorsey to a gun store, where Dorsey purchased a handgun and a box of Fiocchi brand .40 caliber ammunition.

¶ 6     Shortly after midnight that night, the victim and her friend, Christopher Campbell, were parked outside a bar. The victim's goddaughter, Teiasha Stewart, was a passenger in another car parked alongside them. Toler-Anderson drove up, exited his vehicle, and approached the victim's driver's side door. According to Campbell and Stewart, Toler-Anderson then pulled out a gun and shot the victim before running back to his car. Campbell, who was also armed, fired several shots at Toler-Anderson as he fled.

¶ 7     Officers recovered two sets of spent shell casings: one set was located next to the driver's side of the victim's Jeep and the other was found near a side street. The casings near the side street matched Campbell's gun, while those next to the Jeep were Fiocchi

brand .40 caliber ammunition — the same type that Dorsey had purchased.

¶ 8    The People charged Toler-Anderson with first degree murder and illegal discharge of a firearm, later adding two habitual criminal counts.  At trial, Toler-Anderson asserted that he acted in self-defense.  His theory was that the victim lured him to the bar so that Campbell could ambush him, with Stewart and the unnamed driver of her car there as backup.  When Toler-Anderson approached the victim to try to convince her to leave him and his family alone, she opened the Jeep's door to give Campbell a clear shot.  Upon seeing Campbell's gun, Toler-Anderson reacted first, firing as he ran away and hitting the victim.

¶ 9    The jury convicted Toler-Anderson of the lesser included offense of second degree murder and illegal discharge of a firearm.  The district court found that the prosecution had proved the habitual criminal counts, and it sentenced Toler-Anderson to seventy-two years in the custody of the Department of Corrections.

¶ 10    Toler-Anderson now appeals.

## II.    Other Act Evidence

¶ 11    Toler-Anderson contends that the district court erred by (1) admitting evidence concerning CAE without providing a contemporaneous limiting instruction each time such evidence was introduced and (2) admitting evidence that the victim was allegedly forging pay stubs for him to submit to CAE.  We disagree.

### A.    Governing Law and Standard of Review

¶ 12    Under CRE 404(b), evidence of other crimes, wrongs, or acts is not admissible to prove a person's bad character to show that the person acted in conformity with that character on a particular occasion.  But evidence of other crimes, wrongs, or acts may be admissible for another purpose, such as proving motive.  CRE 404(b)(2).

¶ 13    Intrinsic acts — those that (1) directly prove the charged offenses or (2) occurred contemporaneously with the charged offenses and facilitated their commission — are not "other" acts and, therefore, fall outside the scope of CRE 404(b).  *Rojas v. People*, 2022 CO 8, ¶ 52.  In contrast, extrinsic acts that suggest a bad character (and thus a propensity to commit the charged offense) are admissible only as allowed by CRE 404(b) and after

applying the analysis set forth in *People v. Spoto*, 795 P.2d 1314, 1318 (Colo. 1990). *Rojas*, ¶ 52.

¶ 14    For other act evidence to be admissible under CRE 404(b), the district court "must first determine, by a preponderance of the evidence, that the other act happened and that the defendant committed the act." *People v. Vasquez*, 2022 COA 100, ¶ 74 (citing *People v. Garner*, 806 P.2d 366, 373 (Colo. 1991)). The court's findings may be implicit. *Id.* The court must then find that (1) the evidence relates to a material fact; (2) the evidence is logically relevant to that material fact, meaning it tends to make the existence of the material fact more or less probable; (3) the logical relevance of the evidence is independent of the prohibited inference that the defendant has a bad character and committed the crime charged because he acted in conformity with his bad character; and (4) the probative value of the evidence is not substantially outweighed by the danger of unfair prejudice. *Spoto*, 795 P.2d at 1318. And finally, if the other act evidence is admitted, "the court must also, upon request, contemporaneously instruct the jurors of the limited purpose for which the evidence may be considered." *Rojas,* ¶ 27 (citing CRE 105).

¶ 15    A district court has broad discretion to decide whether to admit other act evidence. *Perez v. People*, 2015 CO 45, ¶ 22. We will not disturb the court's decision absent a showing that it was manifestly arbitrary, unreasonable, or unfair, or was based on a misapprehension or misapplication of the law. *Gonzales v. People*, 2020 CO 71, ¶ 25. "In deference to the trial court's discretion, we must assume the maximum probative value and the minimum unfair prejudice to be given the evidence." *Yusem v. People*, 210 P.3d 458, 467 (Colo. 2009).

¶ 16    We review preserved errors in the admission of evidence under the harmless error standard. *People v. Ambrose*, 2021 COA 62, ¶ 53; *see also Yusem*, 210 P.3d at 469 n.16 ("Erroneous admission of CRE 404(b) evidence is not error of constitutional dimension."). A nonconstitutional error is harmless unless there is a reasonable probability that it contributed to the defendant's conviction by substantially influencing the verdict or impairing the fairness of the trial. *People v. Harris*, 2015 COA 53, ¶ 26 (citing *People v. Casias*, 2012 COA 117, ¶ 62).

¶ 17    We review unpreserved errors for plain error. *Hagos v. People*, 2012 CO 63, ¶ 14. An error is plain when it is obvious and

substantial.  *Id.*  An obvious error is one that "contravene[s] a clear statutory command, a well-settled legal principle, or established Colorado case law," *People v. Crabtree*, 2024 CO 40M, ¶ 42, and that a judge should be able to avoid without the benefit of an objection, *People v. Conyac*, 2014 COA 8M, ¶ 54.  "An error is 'substantial' enough to warrant reversal if it 'so undermine[d] the fundamental fairness of the trial itself as to cast serious doubt on the reliability of the judgment of conviction.'"  *People v. Perez*, 2024 COA 94, ¶ 26 (quoting *Cardman v. People*, 2019 CO 73, ¶ 19).

## B.   Additional Background

¶ 18     Before trial, the prosecution filed a notice of intent to introduce other act evidence under CRE 404(b).  The prosecution intended to present testimony from the owner of a beauty salon that Toler-Anderson, after accepting a job offer, "stopped working there after a few days" but "nevertheless continued to demand pay stubs" for submission to CAE.  The salon owner was expected to testify that, after she refused to create fake pay stubs for Toler-Anderson, the victim began making them for him.  But after Toler-Anderson ended his relationship with the victim, the victim "started threatening to expose this fraudulent scheme to [his] case manager

7

at CAE." The prosecution also sought to introduce the victim's text messages threatening to get Toler-Anderson in trouble at CAE and Toler-Anderson's statements in a videotaped interview with a detective describing how the victim was causing problems for him there. The prosecution argued that this evidence was relevant to explain one of Toler-Anderson's potential motives for killing the victim. Overruling the defense's objection, the district court found the evidence admissible under CRE 404(b) and *Spoto*.

¶ 19    In his opening statement, the prosecutor previewed the other act evidence, explaining what CAE was and how the victim had threatened to report Toler-Anderson to his case manager about the fake pay stubs she had created for him.

¶ 20    But the salon owner, who was scheduled to fly in from another state to testify on August 4, 2022, did not board her flight. When the prosecutor informed the court and defense counsel that the salon owner would not testify, defense counsel renewed his objection to any reference to CAE, arguing that Toler-Anderson's commitment to community corrections was no longer relevant. The prosecutor responded that he would present other evidence — apart from the salon owner's testimony — showing that the victim was

threatening to cause problems for Toler-Anderson at CAE. The court again overruled the defense's objection.

¶ 21 The prosecution then played for the jury Toler-Anderson's videotaped interview, in which he said the victim called CAE and got him in trouble by leaving "bad messages" claiming he did not have a job. He admitted that the victim was making his pay stubs but insisted that he really was working at the salon. Although defense counsel again renewed the objection to any "mention of CAE," he did not request a limiting instruction before the video was played.

¶ 22 The jury next heard testimony about CAE from Toler-Anderson's case manager, who explained that he became concerned about Toler-Anderson's "pay stub for his job" because it was missing "a few things . . . that typical W-4 employers have, you know, your FICA deductions, Medicaid, state, federal withholdings." He testified that he called the number Toler-Anderson had provided for his employer at the beauty salon — which was actually the victim's number — and spoke to the victim, who said she would "get it fixed." Before the jury heard this testimony, the court read the following limiting instruction:

> Ladies and gentlemen, the evidence you're about to hear concerning the Community Alternatives facility, sometimes called CAE, is being presented only to allow the jury to consider the plaintiff's claim of motive in this case. You may not consider this evidence for any other reason.

¶ 23 Finally, a detective testified about the victim's text messages to Toler-Anderson, including her texts that she had "left [his] case manager the message" and that he was "going to jail." Defense counsel did not request, and the court did not read, a limiting instruction before the jury heard this evidence.

¶ 24 At the close of evidence, the court repeated its limiting instruction regarding the CAE evidence. This instruction was also included in the written instructions provided to the jury for deliberations.

¶ 25 In closing argument, the prosecutor argued that the victim had been threatening Toler-Anderson and causing problems for him at CAE:

> You saw those text messages. She was texting him that she was contacting his Case Manager at CAE. . . .
>
> She threatened that he would go to jail, and you heard that that was a possibility if he got

10

> word that the defendant wasn't actually working, and that his pay stubs were fake.
>
> And when you watch that interview with the defendant he says that is what was going on. That [the victim] was making pay stubs for him. So he knew, he knew she had the goods on him. He knew she could be the means to cause him to lose his freedom.

### C. Limiting Instruction Concerning CAE

¶ 26 Although Toler-Anderson does not contest on appeal the admissibility of evidence related to CAE, he contends that the district court erred by failing to give a contemporaneous limiting instruction each time the jury heard this evidence. Specifically, the court read a limiting instruction before the testimony of Toler-Anderson's case manager, and again at the close of evidence, instructing the jury that it could consider evidence "concerning the Community Alternatives facility, sometimes called CAE," only with respect to motive, and not for any other reason. But the court did not read the limiting instruction before the introduction of (1) Toler-Anderson's video interview or (2) his text messages from the victim, both of which referenced CAE.

¶ 27 Because defense counsel did not ask the court to give a limiting instruction before the video or text messages were

introduced, we review this assertion for plain error. *See People v. Griffin*, 224 P.3d 292, 298 (Colo. App. 2009) ("Because [the defendant] did not request a limiting instruction, we apply the plain error standard of review."). We conclude that any error in this context was not obvious because, "absent a special statutory requirement, the supreme court has consistently held that trial courts have no duty to give limiting instructions sua sponte." *Id.* Rather, the onus is on the parties to request a limiting instruction. *See Rojas*, ¶ 27 ("If a court determines the evidence is admissible [under *Spoto*], the court must also, *upon request,* contemporaneously instruct the jurors of the limited purpose for which the evidence may be considered." (emphasis added)); CRE 105 ("When evidence which is admissible . . . for one purpose but not admissible . . . for another purpose is admitted, the court, *upon request,* shall restrict the evidence to its proper scope and instruct the jury accordingly." (emphasis added)).

¶ 28      We further conclude that the absence of a limiting instruction before the introduction of the video and text message evidence did not so undermine the fundamental fairness of the trial itself as to cast serious doubt on the reliability of the conviction. The limiting

12

instruction given before the case manager's testimony and, more importantly, at the close of evidence cured any potential prejudice. *See People v. Cousins*, 181 P.3d 365, 373 (Colo. App. 2007) (where the court's "closing charge contained a proper limiting instruction . . . , the failure to give a limiting instruction before [a witness] testified was harmless"); *People v. Marion*, 941 P.2d 287, 293-94 (Colo. App. 1996) (holding that the failure to give a limiting instruction before CRE 404(b) evidence was introduced did not require reversal because a limiting instruction was included in the final jury instructions).

¶ 29    We thus conclude that the court's failure to give a limiting instruction before the video and text message evidence did not constitute plain error.

### D.    Pay Stubs

¶ 30    Toler-Anderson contends that the district court erred by admitting evidence about his pay stubs because (1) the evidence presented at trial was insufficient to establish by a preponderance of the evidence that the pay stubs were forged; (2) the potential for unfair prejudice substantially outweighed the probative value of the evidence; and (3) the limiting instruction about evidence concerning

13

CAE did not specifically address the pay stubs. We address each contention in turn.

### 1. Preponderance of the Evidence

¶ 31 Toler-Anderson argues that, without the salon owner's testimony, the evidence was insufficient to establish by a preponderance of the evidence that his pay stubs "were forged." The People counter that the issue is instead whether the evidence was sufficient to show that Toler-Anderson "was motivated to kill [the victim] because he was concerned about the pay[]stubs she created for him." We agree with the People.

¶ 32 In his video interview, Toler-Anderson said that the victim "made [his] pay stubs" from the beauty salon. He explained that he "really was working there," but the salon owner was "so busy, she couldn't do it, so [the victim] ended up having to do it." He also said that the victim had "called up there [to CAE]" to report that he was lying about having a job in an effort to get him thrown in jail.

¶ 33 In closing argument, the prosecutor reminded the jury of Toler-Anderson's admission that the victim was making his pay stubs. The prosecutor argued that, based on the case manager's testimony, there was indeed "a possibility" that Toler-Anderson

could have gone to jail if it was discovered that he "wasn't actually working, and that his pay stubs were fake." Accordingly, the prosecutor argued, Toler-Anderson "knew [the victim] had the goods on him."

¶ 34 Contrary to Toler-Anderson's position, this was not an argument that Toler-Anderson in fact did not have a job. Rather, it was an argument that he had a motive to harm the victim because he believed she was causing trouble for him at CAE over the pay stubs. The relevant, undisputed facts were that the victim was creating his pay stubs and that she *told him* she had contacted CAE to report him for lying about having a job (even though the case manager testified that she never actually made such a report). Whether Toler-Anderson "really was working" at the salon, as he claimed, was not the point of the prosecutor's argument.

¶ 35 We are not persuaded otherwise by Toler-Anderson's focus on the prosecutor's statement that Toler-Anderson "knew [the victim] had the goods on him." Rather than suggesting that Toler-Anderson did not in fact have a job, we understand this argument as indicating that Toler-Anderson knew the victim could get him in trouble if she chose. Further, because the victim did not have

authority to prepare pay stubs for Toler-Anderson's job at the salon, CAE could have considered the pay stubs she created as "forged" or "fake" regardless of whether he actually worked there.

¶ 36   We therefore conclude that the evidence was sufficient to establish by a preponderance of the evidence that Toler-Anderson was concerned about the pay stubs the victim created for him and that this concern was relevant to his motive to harm her.

### 2.   CRE 403

¶ 37   Next, Toler-Anderson argues that the probative value of the pay stub evidence was substantially outweighed by the danger of unfair prejudice.  *See Spoto*, 795 P.2d at 1318; CRE 403.  He specifically relies on *Yusem*, 210 P.3d at 468, to argue that the pay stub evidence had "negligible" probative value because the victim's stalking and harassment of Toler-Anderson and his family *already* provided a motive for him to harm her.

¶ 38   *Yusem*, however, is distinguishable.  In that case, the supreme court held that, where the defendant was charged with felony menacing for "pulling a gun against the driver of a van who [the defendant] thought was threatening to run him down," the district court erred by admitting "evidence of a prior act where [the

16

defendant], a deputy sheriff, yelled at and caused an apartment manager to feel intimidated while [the defendant] was off-duty but wearing his service weapon." *Id.* at 460. As relevant here, the court held that the prosecution "had ample evidence to prove [the defendant's] mental state and motive" because the defendant "testified that he pulled his gun and yelled at the driver of the van in an attempt to get the van driver to back up." *Id.* at 468. Accordingly, the prior act evidence was "not needed to prove the listed purposes of state of mind and motive." *Id.*

¶ 39 Toler-Anderson's reliance on *Yusem*'s statement that "prior act evidence offers minimal probative value to prove the listed purposes" when those "purposes . . . could be proved by alternative methods" is misplaced. *Id.* *Yusem* does not stand for the proposition that evidence of one motive to harm the victim (such as the victim's threats to cause trouble for him at CAE) loses probative value simply because there is also evidence of a separate, independent motive (her threats to his family). Both motives are relevant for the jury's consideration, as Toler-Anderson could have had multiple reasons for committing the crime.

¶ 40    While Toler-Anderson contends that the pay stub evidence was prejudicial because it may have allowed the jury to infer that he was willing to lie, we must assume the maximum probative value and minimum unfair prejudice. *Id.* at 467. Moreover, the risk of unfair prejudice was low because the other acts at issue (submitting pay stubs created by someone other than his employer, and possibly lying about having a job) were relatively mundane when compared to the actions with which he was charged (first degree murder). *See People v. Dean*, 2012 COA 106, ¶ 46 (probative value of other act evidence was not substantially outweighed by the danger of unfair prejudice because, among other reasons, the testimony "conveyed relatively mundane information when compared with the graphic evidence otherwise admitted at trial"), *aff'd on other grounds*, 2016 CO 14.

¶ 41    We thus conclude that the probative value of the pay stub evidence was not substantially outweighed by the danger of unfair prejudice.

### 3.    Limiting Instruction Concerning Pay Stubs

¶ 42    Finally, Toler-Anderson argues that the district court erred by not specifically referencing the pay stubs in its limiting instruction

about evidence "concerning . . . CAE." In the absence of a specific reference to the pay stubs, he argues, "[t]he jury was never told it could not use the allegation that Mr. Toler-Anderson forged his pay[]stubs to make a propensity inference that he likely acted in accordance with that bad character by murdering [the victim]."

¶ 43 Because defense counsel did not ask the court to specifically refer to the pay stubs in its limiting instruction, or to give a separate limiting instruction regarding the pay stubs, we review this assertion for plain error. *See Griffin*, 224 P.3d at 298. Any error here was not obvious because the court's limiting instruction about evidence "concerning . . . CAE" (or, as it was phrased in the final jury instructions, "regarding . . . CAE") could reasonably have been understood to encompass evidence about the pay stubs Toler-Anderson submitted to CAE, including the victim's threats to get him in trouble at CAE over problems with the pay stubs.

¶ 44 Accordingly, we discern no reversible error regarding the admission of other act evidence.

### III. Prosecutorial Misconduct

¶ 45 Toler-Anderson contends that the prosecutors committed misconduct by (1) calling a witness to testify when they reasonably

should have known the witness would invoke his Fifth Amendment right against self-incrimination; (2) denigrating the defense; (3) encouraging the jury to base its verdict on sympathy for the victim; (4) misstating the evidence; and (5) expressing personal opinions. His first two contentions are preserved; the other three are unpreserved. After setting forth the governing law and standard of review, we address each contention in turn.

### A. Governing Law and Standard of Review

¶ 46 We engage in a two-step analysis when reviewing claims of prosecutorial misconduct. *Wend v. People*, 235 P.3d 1089, 1096 (Colo. 2010).

¶ 47 First, we determine whether the conduct was improper based on the totality of the circumstances. *Id.* We consider the context of the argument as a whole and view it in light of the evidence before the jury. *People v. Samson*, 2012 COA 167, ¶ 30. "A prosecutor has wide latitude to make arguments based on facts in evidence and reasonable inferences drawn from those facts." *People v. Strock*, 252 P.3d 1148, 1153 (Colo. App. 2010), *overruled on other grounds by*, *People v. Kennedy*, 2025 CO 63. The prosecutor may also "employ rhetorical devices and engage in oratorical

embellishment." *Samson*, ¶ 31. Because arguments delivered in the heat of trial are not always perfectly scripted, we give the prosecutor the benefit of the doubt when their remarks are "ambiguous or simply inartful." *Id.* at ¶ 30. But the prosecutor may not misstate the evidence or the law. *Id.* at ¶ 32; *People v. Weinreich*, 98 P.3d 920, 924 (Colo. App. 2004), *aff'd*, 119 P.3d 1073 (Colo. 2005).

¶ 48 Next, if we identify misconduct, then we determine whether it warrants reversal under the applicable standard of review. *Wend*, 235 P.3d at 1096. We review preserved claims of prosecutorial misconduct that do not "specifically and directly offend a constitutional right" for harmless error, and we review unpreserved claims of prosecutorial misconduct for plain error. *People v. Licona-Ortega*, 2022 COA 27, ¶¶ 87-88. To constitute plain error, the misconduct "must be flagrant or glaring or tremendously improper, and it must so undermine the fundamental fairness of the trial as to cast serious doubt on the reliability of the judgment of conviction." *Id.* at ¶ 88 (quoting *Weinreich*, 98 P.3d at 924). "Prosecutorial misconduct in closing argument rarely constitutes plain error." *Weinreich*, 98 P.3d at 924.

## B. Witness's Invocation of Fifth Amendment Right

¶ 49    Toler-Anderson contends that the prosecutors committed misconduct by calling as a witness Dorsey — the man Toler-Anderson drove to the gun store the morning before the victim was killed — when they reasonably should have known that Dorsey would invoke his Fifth Amendment right against self-incrimination. We are not persuaded.

### 1. Additional Background

¶ 50    The prosecution's theory was that the gun Dorsey bought on the morning of the murder was the one Toler-Anderson used to kill the victim.  Although the murder weapon was never recovered, the shell casings found by the victim's vehicle matched the ammunition that Dorsey purchased that morning.

¶ 51    The prosecutors were aware that the Federal Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) was investigating Dorsey for gun trafficking and had sought a warrant in 2021.  They also knew that, when Dorsey purchased the gun, he completed a sworn declaration stating that he was not acquiring the firearm for another person and that his "State of Residence" was Colorado, even though he actually lived in Texas.  The bottom of the

questionnaire warned that falsifying answers was a federal felony offense. Despite this, the prosecutors did not proactively advise Dorsey of his Fifth Amendment right against self-incrimination, inquire whether he intended to invoke that right, or recommend he consult independent counsel.

¶ 52 At trial, Dorsey took the stand, testified briefly that an unknown woman had driven him to the gun store, and then invoked his Fifth Amendment right against self-incrimination. The district court dismissed the jury, appointed counsel to advise Dorsey, and asked the prosecutor if he had known that Dorsey was going to invoke the Fifth Amendment. The prosecutor said he "had no reason to believe that" Dorsey would invoke the right. He said that he asked Dorsey "if he had any questions or concerns" about testifying and that "it never came up."

¶ 53 Defense counsel moved for a mistrial, arguing that — given the ATF investigation and the prosecution's theory that Dorsey procured the murder weapon for Toler-Anderson — the prosecutors knew they were placing Dorsey in criminal jeopardy by calling him to the stand and should have anticipated he would invoke his Fifth Amendment right. The court deferred ruling until Dorsey could

consult with counsel and the prosecution could decide whether to offer him immunity.

¶ 54    The next morning, the prosecutor confirmed that Dorsey had not changed his mind after consulting with counsel and that the prosecution would not offer him immunity.  Before the court released Dorsey, both parties were permitted to question him.  In response to their questions, Dorsey said that the prosecutors never advised him that his testimony could have "criminal implications" or suggested he consult an attorney before agreeing to testify.  He also confirmed that he never told the prosecutors he planned to invoke his Fifth Amendment right.

¶ 55    Defense counsel renewed his request for a mistrial, which the district court denied.  The court then offered to give a curative instruction, but defense counsel said the instruction was not "necessary . . . right now."  At the close of evidence, the court gave the following instruction regarding Dorsey's testimony:

> A witness, Mr. Dorsey, invoked his rights under the 5th Amendment of the U.S. Constitution not to testify.  Because his testimony could not be completed, the jury must disregard any testimony provided by Mr. Dorsey.  Every person has the right to invoke their rights under the 5th Amendment

not to testify. The jury must not draw any negative inferences against the defendant in this case based on a witness's decision not to testify.

### 2. Discussion

¶ 56    Generally, the prosecution may not call a witness to testify when it knows the witness will invoke their right to remain silent. *People v. Newton*, 940 P.2d 1065, 1067 (Colo. App. 1996) (*Newton I*), *aff'd in part*, 966 P.2d 563 (Colo. 1998) (*Newton II*), *abrogated on other grounds by*, *Nicholls v. People*, 2017 CO 71. "The rationale for the rule is that, because of the high courtroom drama and odium surrounding a claim of privilege, questioning of a witness asserting [a Fifth Amendment protection against self-incrimination] before the jury has the effect of prejudicing the accused by creating an unfair inference of guilt." *Newton I*, 940 P.2d at 1067.

¶ 57    To evaluate the harm associated with improperly calling a witness who invokes the Fifth Amendment before the jury, we consider the totality of the circumstances. *Newton II*, 966 P.2d at 570. This analysis includes considering (1) the prosecution's intent in calling the witness; (2) the number of questions the prosecutor

asked the witness; (3) the witness's importance to the prosecution's case; (4) whether the prosecutor draws any inference in closing argument from the witness's refusal to answer the question; and (5) whether the court gave a curative instruction. *Id.*

¶ 58 Critically, Toler-Anderson does not claim that the prosecutors knew Dorsey would invoke his Fifth Amendment right. Rather, he argues that, given Dorsey's potential criminal liability, the prosecutors (1) had "*reason to believe*" Dorsey would invoke his right; and (2) committed misconduct by calling Dorsey without proactively advising him of his Fifth Amendment right, directly asking if he planned to invoke the right, or advising him to consult independent counsel. (Emphasis added.)

¶ 59 For support, Toler-Anderson relies on ABA Criminal Justice Standard 3-3.4 (4th ed. 2017), which provides that a prosecutor "should advise a witness who is to be interviewed of his or her rights against self-incrimination and the right to independent counsel *when the law so require*s." (Emphasis added.) But he does not argue, and we have found no authority to suggest, that Colorado law requires this advisement when a prosecutor has reason to believe that a witness's testimony may expose the witness

to criminal liability.  Indeed, as another division of this court has noted, "No Colorado Supreme Court case has explicitly adopted ABA Standard [3-3.4] or held that prosecutors have such an obligation." *People v. Paglione*, 2014 COA 54, ¶ 24.

¶ 60    Further, even assuming that the prosecutors erred by calling Dorsey without asking him if he planned to invoke the Fifth Amendment or advising him to consult independent counsel, we conclude that, under the totality of the circumstances, the error does not require reversal.  *See Newton II*, 966 P.2d at 570.  The prosecutors' intent was to elicit testimony about Dorsey's firearm and ammunition purchases.  Dorsey's testimony was brief before invoking his Fifth Amendment right.  His testimony was not crucial to the prosecution's case, as other evidence, including Toler-Anderson's cell phone records and the gun store's records and surveillance video, established how Dorsey got to the store and what he purchased.  The prosecutors did not mention Dorsey's testimony again or attempt to draw any inferences from his

invocation of his right against self-incrimination.  And finally, the court gave a curative instruction.[1]

¶ 61    Accordingly, we discern no reversible error.

### C.    Denigrating the Defense

¶ 62    During closing argument, defense counsel urged the jury to question whether the accounts of the two eyewitnesses, Stewart and Campbell, were "completely made up."

¶ 63    In rebuttal closing argument, the prosecutor told the jury:

> Something [defense counsel] just said really rings true.  Made up stories.
>
> I'm struggling a little bit, because I am trying to figure out what to say to you.  Because the story [defense counsel] just told you about the defendant Paris Toler-Anderson isn't based on evidence.  It is a made up story.

---

[1] Toler-Anderson argues that he was prejudiced by the district court's failure to "give the jury any [curative] instructions immediately following Dorsey's invocation."  But the court and the parties did not know, at that point, whether Dorsey would change his mind after consulting with counsel or whether the prosecution would offer him immunity.  When it became clear that Dorsey would not testify, defense counsel asked the court not to instruct the jury about the invocation.  Thus, to the extent the court erred by not instructing the jury before the close of evidence, any error was invited by defense counsel.  *See People v. Rediger*, 2018 CO 32, ¶ 34 ("The doctrine of invited error prevents a party from complaining on appeal of an error that he or she has invited or injected into the case . . . .").

> So I think what we are left with now is evidence of desperation. You heard it in [defense counsel's] voice.

Defense counsel objected, and the court overruled the objection.

¶ 64 Then, after reviewing the evidence supporting a guilty verdict, the prosecutor said:

> We have . . . all the evidence to prove to you beyond a reasonable doubt that Paris Toler-Anderson committed Murder in the First Degree. We presented so much evidence, and [the police] did such a good job of putting together this case, that this is where we are. With a made up story.
>
> Now I don't want to insult your intelligence any more. Find him guilty of Murder in the First Degree.

¶ 65 Toler-Anderson argues that the prosecutor's statements impermissibly denigrated the defense. *See People v. Collins*, 250 P.3d 668, 678 (Colo. App. 2010) (A prosecutor may not "state or imply that defense counsel has presented the defendant's case in bad faith or otherwise make remarks for the purpose of denigrating defense counsel."). From our review of the record, however, it appears that the prosecutor's remarks were not made to mock or personally attack defense counsel, but rather to respond to Toler-Anderson's theory of the case and defense counsel's suggestion that

the eyewitnesses fabricated their stories. *See id.* (prosecutor's rebuttal comment that defendant's theory of reasonable doubt was "absurd" did "nothing more than suggest to the jury that defendant's theory as to why the jury should find a reasonable doubt was so unlikely as to strain credibility"); *People v. Ramirez*, 997 P.2d 1200, 1211 (Colo. App. 1999) (concluding that it was not improper to characterize a defense argument as "blowing smoke" when used to assert that the evidence supporting defendant's innocence lacked substance, rather than to suggest that opposing counsel knew the defense was not meritorious), *aff'd*, 43 P.3d 611 (Colo. 2001).

¶ 66    Although the prosecutor's reference to defense counsel's tone of voice was improper, it was a single reference that was not repeated. Because this comment was "an isolated incident in an otherwise proper closing argument," we are convinced that the error was harmless. *People v. Clemons*, 89 P.3d 479, 483 (Colo. App. 2003).

D.    Encouraging Verdict Based on Sympathy for the Victim

¶ 67    During closing argument, the prosecutor emphasized the "horror" and "trauma" experienced by the two eyewitnesses. He

30

specifically said that Campbell "could feel the vibrations [of the bullets] coming through to him" as the victim "was dying on top of him." He also noted that, when the victim was shot, "[s]he had only an instant to realize what her fate was." Ultimately, he urged the jury to convict Toler-Anderson:

> Hold him accountable, ladies and gentlemen. Deliver justice for [the victim]. Deliver justice for the People of Colorado. Find him guilty beyond a reasonable doubt of Murder in the First Degree.

¶ 68 Toler-Anderson argues that these comments impermissibly encouraged the jury to reach a verdict based on sympathy for the victim. *See Conyac*, ¶ 147 ("Prosecutors may not pressure jurors by suggesting that guilty verdicts are necessary to do justice for a sympathetic victim."). Specifically, he argues that the references to the trauma of the eyewitnesses encouraged the jury to disregard the evidence and "instead base its verdict on emotion" and that the prosecutor's comments about the victim's dying thoughts "were akin to 'channeling,' in which the prosecutor speaks in the first person as the victim." *See People v. Douglas*, 2012 COA 57, ¶ 66 (a prosecutor may not "induce the jury to determine guilt on the basis of passion or prejudice" (citation omitted)); *People v. Manyik*, 2016

COA 42, ¶ 27 ("The prosecutor's technique of speaking to the jury in the first person as though he were the victim" was misconduct.).

¶ 69     Contrary to Toler-Anderson's argument, the prosecutor's comments were grounded in the evidence.  His comment about Campbell feeling the victim die is a fair inference from Campbell's testimony:

> The next moment gunshots ring out.  To my knowledge at that moment I'm thinking I'm hit, she's hit.  The next thing I know her body slumps over into my lap.  I'm yelling, screaming her name.  No response.  At that point I'm thinking I'm hit, but at that point in time I really don't care about me being hit, she's not responding to me.

¶ 70     The prosecutor's comment that the victim had only an instant to realize her fate was not "channeling."  The prosecutor neither spoke in the first person as the victim nor asked the jurors to put themselves in the victim's place.  *Cf. Manyik*, ¶¶ 20-24 (improper "channeling" occurred when the prosecutor "assumed the identity of the victim" for "a substantial part of his opening statement").

¶ 71     Finally, the prosecutor's remarks about delivering justice for the victim came only after a recitation of evidence supporting a guilty verdict.  Far from pressuring the jurors to convict out of

sympathy for the victim, the prosecutor urged the jurors to decide the case based on the evidence.

¶ 72    The comments were not improper.

### E.    Misstating the Evidence

¶ 73    During his interview with the detective, Toler-Anderson claimed that his cousin was in the car with him during the shooting. The cousin, however, denied this and testified that he had been at work that night. The cousin's supervisor corroborated this account by testifying that he recalled the cousin working that night and that he had confirmed his recollection by reviewing the cousin's timecard. After this testimony, the prosecution belatedly disclosed a photocopy of the timecard to the defense. The district court found no prejudice from the late disclosure because the defense knew the supervisor would testify that the cousin was at work and the timecard was not introduced as an exhibit.

¶ 74    During closing argument, the prosecutor referenced the cousin's alibi, stating, "We have his time sheets." Elsewhere in closing, after discussing Toler-Anderson's statements and the eyewitnesses' accounts, the prosecutor said, "[W]e know who did this."

¶ 75    Toler-Anderson argues that, by claiming that the prosecution had the cousin's timecard and knew the identity of the perpetrator, the prosecutor improperly suggested that the prosecution had knowledge of facts beyond the evidence presented at trial. *See People v. Walters*, 148 P.3d 331, 334 (Colo. App. 2006) ("[I]t is not proper for a prosecutor to refer to facts not in evidence . . . ."); *Domingo-Gomez v. People*, 125 P.3d 1043, 1049 (Colo. 2005) (it is improper for a prosecutor to make "assertions of personal knowledge").

¶ 76    Although the prosecutor's comment about the cousin's timecard may not have been perfectly scripted, in context, it referred to the supervisor's testimony that he reviewed the cousin's timecard, rather than to personal knowledge of facts outside the record. Similarly, the prosecutor's comment about knowing "who did this" was acceptable oratorical embellishment; because it followed a discussion of the evidence, the jury was unlikely to understand it as an assertion of secret knowledge.

¶ 77    To the extent either comment was poorly scripted, neither was so flagrantly or glaringly improper as to constitute plain error. *See Licona-Ortega*, ¶¶ 87-88.

## F.   Expressing Personal Opinions

¶ 78    During opening statement, defense counsel highlighted numerous inconsistencies in the eyewitnesses' accounts, arguing that they could not "be trusted."  Specifically, regarding Stewart, defense counsel noted her shifting descriptions of her vehicle's position, her seating location, her vantage point, and the other occupant in her car.  The reason for the inconsistencies, defense counsel argued, was that the eyewitnesses were "telling false stories" to conceal "a setup that had gone wrong."

¶ 79    In closing argument, the prosecutor argued that Stewart's emotional response supported the credibility of her testimony.  Specifically, the prosecutor said:

> [Y]ou saw the body worn camera how overcome [Stewart] was by what she had just witnessed. How she could barely stand up, how she could barely speak she was crying so much.  You saw how it affected her when she came and testified on the stand.

¶ 80    Toler-Anderson argues that the prosecutor's comments were an improper expression of his personal opinion about Stewart's credibility.  *See Wilson v. People,* 743 P.2d 415, 418 (Colo. 1987) ("[I]t is improper for counsel to express his or her personal belief in

35

the truth or falsity of testimony . . . ."). But read in context, the prosecutor's comments were a direct response to defense counsel's argument that Stewart was lying. Rather than expressing his personal opinion, the prosecutor repeatedly drew the jurors' attention to the evidence by emphasizing what they had seen during the trial. Because "counsel may . . . draw reasonable inferences from the evidence as to the credibility of witnesses," *id.*, the prosecutor's comments were not improper.

## IV. Cumulative Error

¶ 81    Finally, Toler-Anderson argues that the cumulative effect of the alleged errors warrants reversal. We disagree.

¶ 82    "The doctrine of cumulative error requires that numerous errors be committed, not merely alleged." *Conyac*, ¶ 152. Under this doctrine, while an error may be harmless in isolation, reversal is required when the cumulative effect of multiple errors or defects substantially affects the fairness of the trial or undermines the integrity of the factfinding process. *Howard-Walker v. People*, 2019 CO 69, ¶ 24.

¶ 83    We have identified only one error in this case. *See People v. Thames*, 2019 COA 124, ¶ 69 ("[A] single error is insufficient to

reverse under the cumulative error standard."). Additionally, in our analysis of several of Toler-Anderson's arguments, we reasoned that even if there was any error, that error was not reversible under the applicable standard of reversal. *Cf. People v. Allgier*, 2018 COA 122, ¶ 71 ("Whether plain errors can even be considered for cumulative error purposes has not been resolved in Colorado."). We further conclude that even if one or more of these additional issues represented an error, the errors, viewed together, did not render Toler-Anderson's trial unfair or affect the integrity of the factfinding process. *See Howard-Walker*, ¶ 24.

## V.    Disposition

¶ 84    The judgment is affirmed.

JUDGE GROVE and JUDGE SCHOCK concur.